# CHARLESTON.

## HATFIELD *v.* WORKMAN.

Submitted September 8, 1891.—Decided December 19, 1891.

1. MISTAKE—ESTOPPEL—BOUNDARIES.

Where a large tract of land was laid off, for the convenience of selling, into smaller tracts by running a base line and laying down the division lines by protraction, which division lines were never actually surveyed, and the coterminus owners of two of said tracts attempt to survey and mark the true division line between their said lots, and in so doing a mistake is made in running said line so as to include a large portion of one of said lots within the other, there being no dispute as to the true boundary, when said mistake is discovered neither of the parties is estopped thereby from claiming his rights, nor can it be construed as a license from the one party to the other to cut timber between the true line and the mistaken boundary.

2. NEW TRIAL.

In a case where all the evidence introduced on the trial is clearly insufficient to warrant a verdict in favor of the plaintiff, and the jury nevertheless finds a verdict in favor of the plaintiff, it will be error to overrule the motion of the defendant to set the same aside, and grant him a new trial. *Wandling* v. *Straw*, 25 W. Va. 692.

*A. Burlew* for plaintiffs in error, cited 27 W. Va. 75 ; 25 W. Va. 227 ; Id. 692, 708 ; 24 W. Va. 354 ; 129 U. S. 689 ; 21 W. Va. 709.

*J. E. Chilton* and *W. E. Chilton* for defendants in error, cited 2 W. Va. 285 ; 14 W. Va. 177 ; 9 W. Va. 438 ; 3 W. Va. 335 ; 32 W. Va. 488.

ENGLISH, JUDGE :

This was an action of trespass, brought by William Hatfield against William Workman, James Pugh, and A. W. Forsythe, in the Circuit Court of Boone county, to recover damages for cutting down and destroying one curly walnut tree of the alleged value of two thousand dollars, and underwood of various kinds of the alleged value of five hun-

dred dollars, then and there growing, standing, and being in and upon a certain tract of land there situate, of which the plaintiff was seised and possessed, and taking and carrying away the same, and converting and disposing thereof to their own use, by which the said land and realty was greatly injured, to the plaintiff's alleged damage of two thousand dollars.

On the 16th day of April, 1888, the defendant William Workman appeared by his attorney, and pleaded not guilty, and issue was thereon joined. On the 16th day of July, 1888, Samuel Bradley, the county surveyor of Boone county, was directed, after giving the parties or their attorneys ten days' notice, to do such surveying as either party might require, which surveyors plat and report, in pursuance of said former order, was returned and filed on the 16th day of October, 1888; and on the 18th day of April, 1889, said case was submitted to a jury which resulted in a verdict in favor of the plaintiff for the sum of six hundred and twenty five dollars; and thereupon, the defendants, by counsel, moved the court to set aside said verdect, and grant them a new trial, upon the grounds that said verdict is contrary to the law and the evidence in the case; which motion, being heard, was overruled; to which ruling of the court defendants, by their counsel, objected and exeepted; and judgment was rendered against the defendants William Workman and F. A. Forsythe for the sum of six hundred and twenty five dollars, with legal interest thereon from the 19th day of April, 1889, till paid, and costs; and from this judgment the defendant obtained this writ of error.

The evidence adduced in the cause by both plaintiff and defendant was certified by the court, which discloses the fact that both plaintiff and defendant derive their title to the land in controversy from a common source, to wit, from Alfred Beckley, the commissioner of forfeited and delinquent lands for the county of Fayette, the land conveyed being a part of one hundred and seventy four thousand six hundred and seventy three acres patented on the 9th day of January, 1796, to Thomas Rutter and Reuben Etting, assignees of William Duvall, forfeited for failure to enter the same on the commissioner's books, and for the non-

payment of taxes; which land, for convenience in selling, was platted in various tracts, which were numbered, and the division line between lots Nos. 26 and 27, or rather the proper location thereof, causes the controversy in this case. Lot No. 27 was purchased by one William Walker from said Alfred Beckley; said William Walker conveyed three thousand acres thereof adjoining the line between said lots Nos. 26 and 27 to Joseph Workman; and by subsequent conveyances a portion of said lot No 27 was conveyed to the defendant in error William Hatfield, and also by several conveyances said lot No. 26 was conveyed to the plaintiff in error William Workman, which two tracts of land adjoining each other along the original division line between said lots Nos. 26 and 27, which were laid off as aforesaid by Alfred Beckley, commissioner as aforesaid. .

It appears that said Beckley, in dividing said lands into lots, only ran a base line along one side thereof, which was divided into sections a mile in length, and at the end of each mile was a marked tree. The beginning corner at a maple and sugar was well known and recognized, and the corner of lot No. 26 was fixed at the two-mile tree, and the division line between lots 26 and 27 was never surveyed, but was laid down by protraction. Said lot No. 26 was laid down as a regular parallelogram, fronting three miles on the base line; and having the beginning corner fixed, and the courses and distances given, no surveyor could make a mistake in locating the same.

With these *data*, S. E. Bradley, the surveyor of Boone county, in pursuance of an order of court, surveyed and platted said lots Nos. 26 and 27, and in his report located the true division line between said lots Nos. 26 and 27, and he further reported that the valuable walnut tree over which said suit occurred between said Hatfield and Workman *et al.* was found to be two hundred and eighty four poles from said division line, in said lot No. 26. The plaintiff, however, in order to show that this walnut tree was located in said lot No. 27, attempted to show that a line had been agreed upon between the respective owners of said lots which included said walnut tree within the bounds of said lot No. 27; and Andrew Workman was introduced as

a witness, and was asked : "Please state if you know any-thing about certain tracts of land in Boone county, West Virginia, known and designated as lot Nos. 26 and 27. If so, who formerly owned them, and who owns them now?" and answered: "I know the lots perfectly well, where they lie, and that they join each other, and are situate in the south-west of the county of Boone, on the waters of Pond creek of Little Coal river, and of the Laurel Fork of Spruce Fork of Little Coal river, and near Buffalo creek. A company consisting of myself, Joseph Workman, and others bought lot No. 27 and lot No. 23. I do not know who bought lot No. 26. Afterwards a man by the name of David Mangus owned the tract No. 26, and adjoining the tract No. 27. I do not know who owns the lot No. 26, and I think William Hatfield, the plaintiff, owns the larger portion of tract No. 27. I sold the tract to him ; that is the greater portion of the tract I owned."

He was also asked : "Please state if any line was ever agreed between the owners of lot No. 26 and lot No. 27. If so, when, between whom, and where was the division line fixed ?" and answered : "There was a line agreed be-tween David Mangus and myself. David Mangus at that time owned lot No. 26, and I owned a part of lot No. 27. The agreed line was made about forty years ago. We got Isaac Morgan, a surveyor, to run the line between us. Myself and Joseph Mangus carried the chain, and David Mangus marked the line. We began on the division line on a creek called the ' Skinned Poplar of Laurel Fork of Spruce Fork of Little Coal River,' nearly due east up what we called in that day and time the 'Big Lock Ridge,' " etc.

In answer to question 5 he says : "I knew a very large black-walnut tree standing on the head of Cow creek, in a hollow called the 'Right-Hand Fork of Cow Creek.' The line we run, which is above described, left the said walnut tree standing in lot No. 27 as we run it, and I owned part of lot No. 27 at that time."

On cross-examination he was asked, "Did you, or did you not, think that you were running on the line laid down by Commissioner Beckley in his division of this tract into lots ?" and answered, "That was what we were aiming to do.

We wanted to find where our land joined." He was then asked, "Was there any disputed line between yourself and Mr. Mangus?" and answered, "There was no disputed line." He was then asked, "From information that you have since received, have you, or have you not, found that you were deceived in the distance from the starting point on Buffalo to the place where you started on the division line between lots 26 and 27?" and answered, "From the original map we were deceived."

David Mangus, another witness, was asked on cross-examination, "You state in your original deposition that you and Andrew Workman agreed upon a division line. Did you, or did you not, think when you ran this line that you were running on the original and actual division line between lots Nos. 26 and 27?" and answered, "There had never been no division line, and me and Workman run it to ascertain whether the line took the mouth of Denison or not, and it did not include the mouth of Denison to said Workman, and said line was satisfactory to both parties." He was also asked, "Did you understand that there was an established corner where you started on Buffalo creek?" and answered, "No, I did not;" and in answer to the question, "Then, why did you begin to measure on Buffalo?" answered, "I can not answer this question, as I depended on the surveyor who had the papers for a beginning." He also states that the land was wild and uninclosed along the line made by him and Andrew Workman.

Several of the witnesses state that if they followed this line, which is spoken of as an agreed line, said walnut tree would be included in said lot No. 27. Then, according to the survey made by Surveyor Bradley under the order of the court, and who commenced at a well-known and recognized corner, said line run by Workman and Mangus was run more than two hundred and eighty four poles too far south, as said walnut tree stands that distance within the bounds of said lot No. 26, and the way they ran the line it included the walnut tree in lot No. 27, and they state that this line was run to determine whether the mouth of Denison was in lot No. 27 or not. There was no dispute about the line, but Andrew Workman admits that he was deceived

in regard to its locality. They were not attempting to fix or establish any new line, but Workman says they were aiming to run the line laid down by Commissioner Beckley in his division of this tract into lots. There is no evidence in this case that, after said line was run to ascertain in which lot the mouth of Denison would fall, either of the parties ever recognized it, or in any manner treated it, as the boundary line between said tracts. It ran through wild and unimproved lands, and was evidently run by mistake; it being shown by the correct survey that said line run by Mangus and Workman included as part of lot No. 27 a strip of land two hundred and eighty four poles wide and one thousand, six hundred poles long, containing an area of two thousand eight hundred and forty acres, which properly belonged to said lot No. 26, and constituted nearly one third of the entire lot.

Andrew Workman in his deposition stated there was no disputed line between himself and Mr. Mangus, and he explains what he meant by saying there was an agreed line between them, by stating that they were aiming to run on the division line laid down by Commissioner Beckley; and that is what they evidently thought they were doing, and it can not be presumed for a moment that Mangus would have intentionally fixed a division line which would deprive him of over two thousand, eight hundred acres of his land. All that appears to have been done by these parties, Workman and Mangus, was to run and mark this line. There never was any other recognition of it, no improvement or fence along it, and nothing else to indicate possession or ownership on either side of the line. Andrew Workman who was interested, and would be benefited by maintaining the line marked by himself and Mangus as the true division line between lots Nos. 26 and 27, says, upon examination of the original maps, that they were deceived as to the locality of the starting-point from which to run said division line; and of course, if they started at the wrong point to make such division line, even if they ran the right course, they necessarily marked the wrong line. This line was not run for the purpose of settling a disputed boundary, but was run for the purpose of ascertaining and

marking a division line between said lots Nos. 26 and 27, which never had been run and marked; and the evidence clearly demonstrates a grave error was committed in so doing.

Counsel for the defendant in error in this case rely upon the case of *Gwynn* v. *Schwartz*, reported in 32 W. Va. 487 (9 S. E. Rep. 880); but the facts in that case were very different from those in the case at bar. In that case there was a dispute in regard to the division line between said Gwynn and Schwartz, which gave rise to the action of ejectment. In that case, D. C. Sayre, who was a suveyor, himself divided a tract of land among some of his children, and as to the line in controversy he marked trees upon it, and these trees were pointed out to parties wishing to purchase one of the lots by the party under whom the plaintiff claimed; and although the division line called for was a straight line, yet Rollins, a surveyor, ran this division line, and so ran it and marked it as to make the trees marked by D. C. Sayre before the deed was made stand upon the line, although, in so doing, he ran a crooked line. The defendant cut timber up to this line, and claimed it as a division line, and the plaintiff made no objection. The plaintiff, and those under whom he claimed, knew that the defendant claimed the line run and marked by Rollins to be the true line, and had warned Van Metre, the party under whom plaintiff claimed, not to cut timber beyond this line.

The land in controversy in that case was located between the straight line and the crooked line. The one party was claiming by calls of the deed; the other, by the marked trees. Those trees, however, had been marked at the time the land was run off to indicate the true division line; but in the case at bar the trees were marked in attempting to locate a line which never had been run, but had been laid down by protraction; and one of the parties who ran it, and. is interested in establishing the marked line as the true line, admits that said line was made under a mistake and is erroneous. Said line was not made to settle a disputed boundary, and therefore the fifth section of syllabus in the case of *Gwynn* v. *Schwartz*, to wit, that "disputed boundaries between two adjoining lands may be settled by

express oral agreement executed immediately, and accompanied by possession," does not apply to the case under consideration.

A case, however, which was very similar to the one under consideration, is the case of *Manufacturing Co.* v. *Packer* reported in 129 U. S. 688, and 9 Sup. Ct. Rep. 385, where it was held that "a consent by coterminous proprietors of real estate to mark a boundary line supposed to run according to the marking between undisputed tracts, given by both in ignorance of the real facts and of the existence of a conflict, does not estop either from claiming his rights when the mistake is discovered; nor can it be construed as a license from the one party to the other to cut timber on the disputed tract up to the mistaken boundary line."

In the case at bar the boundary line of lots Nos. 26 and 27—the false line—was run by the parties in interest in ignorance of the real facts as to the true beginning corner; and we must hold, in accordance with the decision just quoted, that a line thus marked would be binding upon neither party, nor would it prevent either one from asserting his rights when the error was discovered, or be construed as conferring a license to cut timber beyond the true line.

In the case of *Manufacturing Co.* v. *Packer, supra,* Justice LAMAR, in delivering the opinion of the Supreme Court, quotes with approval the remarks of Justice GIBSON from the opinion delivered in the case of *Perkins* v. *Gay,* 3 Serg. & R. 327, 331, as follows : "If the parties, from misapprehension, adjust their fences, and exercise acts of ownership, in conformity with a line which turns out not to be the true boundary, or permission be ignorantly given to place a fence on the land of the party, this will not amount to an agreement, or be binding as an assent of the parties ; and I agree it is a principal of equity that the parties to an agreement must be acquainted with the extent of their rights, and the nature of the information they can call for respecting them, else they will not be bound. The reason is that they proceed under an idea that the fact which is the inducement to the agreement is in a particular way, and give their assent, not absolutely, but on conditions that are fal-

sified by the event;" citing *Turner* v. *Turner*, 2 Rep. Ch.
81; *Bingham* v. *Bingham*, 1 Ves. Sr. 126; *Gee* v. *Spencer*,
1 Vern. 32; *Pusey* v. *Desbouvrie*, 3 P. Wms. 316.

Justice LAMAR then says: "The decision in the other
states generally support the rule that owners of adjacent
tracts of land are not bound by consent to a boundary
which has been defined under a mistaken apprehension
that it is the true line, each claiming only the true line,
wherever it may be found, and that in such case neither
party is precluded or estopped from claiming his own rights
under the true one, when it is discovered. Nor can such
consent, in an action of *trespass quare clausum fregit*, upon
the theory of leave and license given, operate as an estop-
pel upon the claim of a plaintiff to recover damages to the
extent of the value of the timber taken, any more than it
can, under the plea of *liberum tenementum*, divest his title to
land on which the alleged cutting and removal were com-
mitted."

See also, the case of *White* v. *Ward*, *supra*, p. 418 (14 S. E.
Rep. 22) (decided by this Court at the present term) in
which it is held (point 2 of syllabus) that "the acquiescence
or admission of the owner of land, made under a mistake
as to his rights, should neither estop nor prejudice him
from subsequently enlarging his possession to the limits of
his deed, provided no actual adversary possession had in-
tervened to defeat his title."

There can be no question that the line in the case we are
considering was run and marked under a mistake and mis-
apprehension; and, as we have seen, when the mistake was
discovered, as it was in this case, the parties would not be
precluded from showing the mistake under which it was
made, and that it should have no binding effect upon either
of them. See *Smith* v. *Davis*, 4 Gratt. 50, in which the syl-
labus is as follows: "Commissioners are appointed to divide
a tract of land. They fix the corners of the dividing line,
and intend that the division shall be by a straight line from
one of these corners to the other, and the line is so de-
scribed in their report, and so laid down on the plat, which
they return to the court. In fact, however, the land being
covered with a thick wood, the line which they mark is not

straight. In cross-actions of ejectment and trespass between the owners of the two tracts, held, the line as it was intended to be, and not the marked line, is the true division line."

It appears from the evidence that the witness Pugh, in the first place, purchased the walnut tree in controversy from William Hatfield, and paid him fifty dollars on the purchase-money. Said Hatfield had some surveying done, and from some cause returned the fifty dollars to Pugh, and made an agreement with him that, if it should be ascertained that said tree was not on his (Hatfield's) land he was to allow a free right of way to remove said tree.

As to instruction No. two asked for by the plaintiff in error, we think the court committed no error in rejecting the same, asked for at the time it was, and under the circumstances; the court having already given the same instruction in substance, and the jury having returned into court prepared to deliver their verdict. We are, however, of opinion that all the evidence introduced on the trial in this case was clearly insufficient to warrant a verdict in favor of the plaintiff. It was therefore error in the court below to overrule the motion of the defendants to set the same aside, and grant them a new trial. See *Wandling* v. *Straw*, 25 W. Va. 692.

For these reasons the judgment complained of must be reversed, the verdict set aside, and the cause remanded with costs to the plaintiff in error.

REVERSED. REMANDED.