# CHARLESTON.

## MILLER v. SHENANDOAH PULP CO.

Submitted September 8, 1893.—Decided December 2, 1893.

1. WATER-RIGHTS.

   The grant of the water privileges below established mills will be so construed as to preserve the water power of such mills undisturbed, unless a contrary intent plainly appears from a reasonable construction of the instrument conveying the grant.

2. WATER-RIGHTS.

   The privilege of turning the waters of a river down a canal does not carry with it the right to dam such waters back by head gates or otherwise, so as to destroy the water-power of mills already established.

3. WATER-RIGHTS—DAMAGES.

   If, to preserve himself from injury or loss, a person should deem it necessary to unlawfully damage the property of another, the law requires a just compensation to be paid for such damage.

4. WATER-RIGHTS—DAMAGES—JURY.

> The jury are the judges of the compensation to be paid in case of wrongful damage to real property, and the court will not disturb their finding unless plainly unwarranted by the evidence.

A. W. McDonald, F. Beckwith and J. D. Butt for plaintiff in error cited Greenl. Ev. (15th Ed.) § 82, 83; 24 W. Va. 686; 3 Kent Comm. 507; Id. 440; 9 Am. & Eng. Ency. L. 45; 18 Barb. 80; Ang. Wat. Con. § 158; 4 Am. & Eng. Ency. L. "Dams" 983; 40 Am. Dec. 472; 4 B. Mon. 573; 81 N. Y. 558; 87 N. Y. 422; 7 Pa. St. 222; 11 Am. & Eng. Ency. L. 517; 15 Am. & Eng. Ency. L. 492; 23 W. Va. 124; 3 Am. & Eng. Ency. L. 869; 21 W. Va. 709.

F. W. Brown and G. Baylor for defendant in error cited 11 Am. & Eng. Ency. L. 513, 517, 518; 9 Am. & Eng. Ency. L. 45; 2 Min. Inst. 1066; 35 W. Va. 261, 271; 4 Lead. Cas. Real Pro. 317; 24 W. Va. 671; 26 W. Va. 788; 19 How. 263; 23 W. Va. 453.

Dent, Judge :

Edward W. Miller instituted a suit in the Circuit Court of Jefferson county to recover damages for permanent injury done to his mills and water power on the Shenandoah river by the erection and maintenance of a dam and gates by the Shenandoah Pulp Company, and on the 10th day of December, 1892, recovered judgment for the sum of three thousand seven hundred and fifty dollars.

The defendant obtained a writ of error to this Court, and insists that the Circuit Court erred : (1) In not arresting the judgment and granting a new trial. (2) In not permitting the witness W. L. Black, for the purpose of showing that the use of the head gates complained of in the declaration were necessary and essential to protect the defendant's property and that of other riparian owners below the dam, to answer the following questions, viz : "What would be the effect in times of a freshet in the Shenandoah river upon the mill-property of the defendant, and the property of other riparian proprietors below, without the use of these head gates at the dam ?" (3) In refusing to give the following instructions :

"Instruction No. 1. The court instructs the jury that by the terms of the grant from John Strider and wife to the U. S. of America, dated the 27th day of June, 1833, the government of the U. S. had the right to the use of all the water in the Shenandoah river, and, to effect this use, had the right to complete and perfect the dam above and nearly opposite the Guelph mill, either by extending or raising the same, or by both means, to an extent sufficient to catch all the water in said river; and if the jury believe, from the evidence, that the defendant was the owner of the right of the U. S. at the time of the wrongs alleged in the declaration, then they must find for the defendant, even though they should believe that the said dam was either raised or extended, or raised and extended, by the defendant.

"Instruction No. 2. The court further instructs the jury that if they believe, from the evidence, that the defendant (the Pulp Co.) could not, without liability to injure itself and other riparian proprietors below, use the waters gathered by said dam without the building of the head gates mentioned in the declaration, and further believe that without said head gates the defendant could not reasonably enjoy his rights under the said Strider deed, then the putting in of said head gates are an incident to the right to raise and extend the said dam, and they must find for the defendant upon the question of damages occasioned by said head gates."

The defendant further insists that the court below erred in giving the following instruction for the plaintiff:

"If the jury believe from the evidence, that the defendant has, in the manner alleged in the declaration, unlawfully injured the property of the plaintiff, and that such damage and injury is of a permanent character, and affects the value of plaintiff's property, then they will find for the plaintiff a sufficient amount as will be a full compensation for such permanent injury."

(4). The defendant also insists that the court below erred in not setting aside the verdict as contrary to the law and evidence.

The issue was joined on the plea of not guilty.

The fact is clearly established that the defendant's dam and head gates do back the waters of the Shenandoah to the foot of Bull's falls, and thus entirely destroy the water power at the plaintiff's mills, and for some distance above them. Both parties derive title through successive alienations from John Strider, and the defendant insists that it had the right to build its dam and construct its watergates by virtue of the deed from said Strider and wife to the government of the United States bearing date the 27th day of June, 1833. The plaintiff denies any such grant by this deed. On the construction of its provisions this case depends. The disputed questions are contained in the following recital from this deed:

"That the said John Strider, and Sarah, his wife, for and in consideration of the sum of two thousand six hundred dollars, lawful money of the United States, to them in hand paid by the said United States of America (through the Hon. Lewis Cass, secretary of war) at and before the ensealing and delivery thereof, the receipt whereof is hereby acknowledged, have granted, bargained, and sold, aliened, enfeoffed, released, and confirmed, and by these presents do grant, bargain, and sell, alien, enfeoff, release, and confirm unto the United States of America and assigns forever, all the right, title, interest, claim, and demand whatsoever of the said John Strider, and Sarah, his wife, of, in, and to the use and privilege of the waters of the Shenandoah river between the mills of the said Strider, called the 'Guelph Mills,' and the public works belonging to the United States on said river below, the fall in the river from the said mills to the termination of the land of said Strider being two feet three inches, commencing two feet five inches below the top of an iron bar now inserted in a rock situated in the tail race of the mill of said Strider, said bar being twenty three feet six inches distant from the south corner of said mill. The said John Strider, and Sarah, his wife, for the consideration before mentioned, grant, bargain, and sell unto the United States of America the privilege of completing and-perfecting the dams now extending partly across the Shenandoah river above and nearly opposite the said Guelph mills, so as to increase the supply of water to

71

any extent passing down the canal that leads to the rifle factory ; also, the privilege of increasing the depth and width of the present canal extending from the dams last mentioned past the mills of said Strider to the rifle factory ; also, the privilege of increasing and extending the dam or dams at the head of the canal or race which supplies the mills of said Strider with water, and of increasing the depth and width of said canal or race, and of constructing waste weirs in the same at such places as may be considered necessary by the surperintendent of the Harper's Ferry Armory, his successor, or any future agent of the United States, for obtaining water for the public works now established, or which may hereafter be established, by the United States, at or near the rifle factory on the Shenandoah river ; provided, however, that such waste weirs shall not be so constructed as to prevent the free passage to the mills, *etc.*, of said Strider, or whatever quantity of water he may require, without, however, lessening the force or quantity of water required by the United States. And the said John Strider, and Sarah, his wife, for the consideration before mentioned, grant and convey to the United States of America and their assigns forever the privilege of erecting a dam or dams partly or entirely across the Shenandoah river at any point or points below the mills of said Strider, the height of which, however, shall not be more than eight inches above the top of an iron bar now inserted in a rock, situated near the upper end of the island on which the rifle factory is located, being the second rock of a ledge of rocks extending from said island nearly across the Shenandoah river in the direction of south, twenty nine and three fourth degress west. The said iron bar is inserted in said rock so that the top thereof is even with the surface of the highest point of said rock."

The first grant is "to the use and privilege of the waters of the Shenandoah river between the mills of said Strider, called the 'Guelph Mills,' and the public works belonging to the United States on said river below, the fall in the river from the said mills to the termination of the land of said Strider being two feet three inches, commencing two feet five inches below the top of an iron bar now inserted in a

rock situated in the tail race of the mill of said Strider; said bar being twenty three feet six inches distant from the south corner of said mill." This fixes a point of beginning, above which Strider continued his ownership, below which he granted to the United States. This point being once determined, neither the United States nor their vendees could have any rights above it, as the law is well settled that a riparian owner may swell water, when it is in its natural state, by a dam erected below to his neighbor's line above, but no further, without being guilty of a wrong.   4 Am. & Eng. Enc. Law, 971; *Navigation Co.* v. *Coon*, 47 Am. Dec. 474; *Bell* v. *McClintock*, 34 Am. Dec. 507.

This point, so carefully fixed, has not been ascertained in the evidence; and the defendant insists that it is destroyed as a boundary point by the after clauses of the deed. While we can not agree with his ingenious argument on this question, yet, as the evidence fails to disclose the ascertainment of this iron bar, its actual location can have little to do with the determination of this case.

The next grant to the United States is "the privilege of completing and perfecting the dams now extending partly across the Shenandoah river above and nearly opposite the said Guleph mills, so as to increase the supply of water to any extent passing down the canal that leads to the rifle factory." This clause must be construed so as not only to include the one dam nearly opposite the Guelph mills, but also the dams above the mills, all of which the United States were granted the privilege of completing and perfecting, so as to increase the supply of water to any extent passing down the canal that leads to the rifle factory. It was by a combination of all these dams the United States were to have the privilege of turning all the waters down the canal, and not by the dam opposite the Guelph mills alone, as is mistakenly argued by counsel.

Next, it is granted "the privilege of increasing the width and depth of the canal extending from the dams last mentioned (that is, this combination of dams) past the mills of said Strider to the rifle factory;" that is, the whole length of Strider's land, so as to convey any increased volume of water needed for the works.

Then follows the grant of "the privilege of increasing and extending the dam or dams (belonging to the combination before spoken of) at the head of the canal or race which supplies the mills of said Strider with water, and of increasing the depth and width of said canal or race, and of constructing waste weirs (dams, not ways, as counsel claim) in the same at such places as may be considered necessary by the superintendent of the Harper's Ferry Armory, his successor, or any future agent of the United States, for obtaining water for the public works now established, or which may hereafter be established, by the United States, at or near the rifle factory on the Shenandoah river: provided, however, that such waste weirs shall not be so constructed as to prevent the free passage to the mills, *etc.*, of said Strider, of whatever quantity of water he may require, without, however, lessening the force or quantity of water required by the United States."

Lastly, the United States are granted "the privilege of erecting a dam or dams partly or entirely across the Shenandoah river at any point or points below the mills of said Strider, the height of which, however, shall not be more than eight inches above the top of an iron bar now inserted in a rock situated near the upper end of the island on which the rifle factory is located." This last point is not shown in evidence, but it is certainly safe to presume that the object was to prevent the erection of a dam so high as to cause the water to flow back on Strider's mills. Such would be the natural inference until at least some other reasonable motive or purpose is disclosed. But this, like the other iron bar referred to, being unascertained, can have but little weight in the decision of this case.

To recapitulate. There are three grants as to dams : (1) The government is authorized to complete and perfect the dam opposite, and the dam or dams above, Strider's mills, so as to increase the supply of water to any extent passing down the canal that leads to the rifle factory; (2) also, in addition to completing and perfecting, the government is authorized to increase and extend the dam or dams above the mills; (3) to erect new dams across the river below Strider's mills, the height of which is limited.

Counsel in their arguments insist that this first clause, as to the completing and perfecting, only applies to the dam opposite the mills; but a careful consideration should convince them that such can not be the case—First, because there was only the part of one dam opposite the mills; and, second, if the government had the right to increase this one dam to such an extent as to increase the supply of water without limitation, it would not have had any use for the dam or dams above the mills, and it was because it could not get this privilege that it found it necessary to acquire the right to complete, perfect, increase, and extend the dams above the mills, so that the supply of water to pass down the canals could be increased without limit. The lower dam was only intended to turn the overflow from the upper dams into the canal, while the privilege of constructing the dams lower down was for the purpose of giving the government a larger basin of water, without interfering with the water-power of Strider's mills. The water from the lower dam was to flow into the canal unobstructed by waste weirs or head gates; but whatever waste weirs the United States might need for storing water were to be constructed above, and not below, Strider's mills, and then in such manner as to allow the water to flow freely to said mills, unless the United States might temporarily stop it, until the storage supply was of sufficient quantity to supply the United States works as well as Strider's mills. In this last case the United States was to keep up Strider's dams; and hence it was a great benefit to him, as it relieved him of a very heavy expense, and he could well afford to subordinate his use of the water from the upper dams to that of the United States, as the water, whenever permitted to pass the waste weirs, would be used in turning his mills before it reached the works of the United States. If the United States had, or could have obtained, the privilege, as to the lower dam, claimed by this defendant, they could have made the one dam so extensive and strong, and put in such ample waste weirs or head gates, that it would have had all the water supply and power it needed without purchasing the privilege and undertaking the expense of increasing and extending the dam or dams

above the mills, and of putting in waste weirs or gates, or obtaining the privilege of building other dams below. It would have been much cheaper and better to have erected one strong and massive and permanent dam with extensive head-gates, after the manner of this defendant, than to keep up a combination of dams and waste weirs; and the only reasonable deduction for its not being done is that the water-rights of the Strider mills were in its way. But these water-rights did not stand in the way of this defendant; for it not only did not keep up the dams above the mills, but it constructed a commodious dam and extensive head gates in lieu of waste weirs below Miller's mills, and destroyed his water-power entirely, back to Bull's falls. The United States preserved and added to the water-power of the mills in controversy; this defendant confiscates and destroys it. For this privilege, assumed by it unlawfully, without purchase or condemnation, it should cheerfully pay a just compensation—a full equivalent for the permanent character of the damage done. The two instructions asked by it were properly refused.

The defendant insists that the verdict of the jury as to the amount found is not sustained by any reasonable view of the evidence, and refers to *Black* v. *Thomas*, 21 W. Va. 709; *Hatfield* v. *Workman*, 35 W. Va. 578 (14 S. E. Rep. 153) *Wandling* v. *Straw*, 25 W. Va. 692.

The plaintiff's title was sufficiently established for the purpose in issue. Not having been attacked in any manner in the lower court, proof on his part that he was the owner and in possession of the property was sufficient; and any technical questions of title will be presumed to have been waived, and will not be permitted to be raised for the first time in this Court. The jury are the sole judges of the amount of the damages inflicted, and, unless their finding is plainly unsustained by the evidence, such finding will not be disturbed. The references of the defendant sustain this proposition. The evidence in this case shows that the fall in the river from Bull's falls, three fourths of a mile above, is six feet to Miller's mills; that the present dam and head gates have entirely neutralized this fall, and the water is backed up over the mill

wheel, completely destroying its use. The damage sued for here, is permanent, and a recovery confers a license on the defendant to continue the cause indefinitely. It is a taking of Miller's property for the use of the defendant without condemnation or purchase; so that, in arriving at a verdict, the jury must take into consideration the value of the water-power from Bull's falls to the plaintiff's mills, as well as the damage occasioned to the mills by reason of the permanent loss thereof.

The plaintiff, in his evidence, states the damage at about ten thousand dollars, one third of the value of the property, in his estimation. His son Francis states the damage to be from ten thousand dollars to fifteen thousand dollars. The opinions of no other witnesses are given as to the amount of damages, except to say it is considerable. The defendant introduces no evidence to contradict these opinions, nor to establish the market value of the property, but relies entirely on its adverse title under the Strider deed to the United States. It is the settled law of this state that the opinions of witnesses are admissible as to the amount of damage done in cases of this character, to enable the jury to arrive at a just verdict; and, while the jury are not bound by these opinions, they have the right to give them such weight as, taken together with the other evidence, is justifiable. The jury might have found a much larger verdict, and still have been sustained by the evidence. The instruction given for the plaintiff states the law correctly, and was properly given. *Railroad Co.* v. *Foreman*, 24 W. Va. 662; *Hargreaves* v. *Kimberly*, 26 W. Va. 788.

There was no error committed against the defendant in refusing to allow the witness Black to answer the question propounded to him in regard to the head-gates. It could make no difference to plaintiff how much the defendant damaged its own property or that of other riparian owners. His property could not be taken unlawfully to avoid such damage without just compensation. The establishing this fact wou'd not have benefitted the defendant's case, and it might have increased the moral obligation at least on the part of the defendant, to pay Miller for his

property, and furnish a further reason why it should compensate him to the full extent of the unauthorized wrong done him.

Our conclusion, therefore, is that there is no error in the judgment of the Circuit Court; and it is affirmed with costs and damages according to law.