OF THE

# SUPREME COURT OF APPEALS

## OF WEST VIRGINIA.

## SPRING-SPECIAL TERM, 1893.

## CHARLESTON.

TEASS *v.* CITY OF ST. ALBANS, *et al.*

Submitted January 28, 1893.—Decided March 22, 1893.

1. POSSESSION.

Actual possession of land is *prima facie* evidence of ownership in fee, and such owner is *prima facie* entitled to such possession. (p. 22.)

2. NUISANCE MUNICIPAL CORPORATION.

A municipal corporation can not by its mere declaration, that a dwelling house is a nuisance, subject it to removal. (p. 19.)

3. NUISANCE —MUNICIPAL CORPORATION.

It must first resort to some proper judicial proceeding, giving the owner or occupant an opportunity to be heard, before his house is condemned and removed as a nuisance. (p. 22.)

| | |
|---|---|
| 38 | 1 |
| 39 | 621 |
| 38 | 1 |
| 40 | 478 |
| 38 | 1 |
| 45 | 132 |
| 38 | 1 |
| 46 | 545 |
| 46 | 547 |
| 46 | 554 |
| 38 | 1 |
| 48 | 189 |
| 38 | 1 |
| 49 | 672 |
| 38 | 1 |
| 56 | 343 |
| 38 | 1 |
| 58 | 258 |
| 38 | 1 |
| f62 | 592 |

4. BOUNDARIES.

In determining the boundaries of lands ascertained objects, natural landmarks and reputed boundaries control mere course and distance.  (p. 12.)

5. BOUNDARIES.

Disputed boundaries between adjoining lands may be settled by express oral agreement, executed immediately and accompanied by possession according to such agreement.  (p. 16.)

6. LIMITATIONS OF ACTIONS—MUNICIPAL CORPORATIONS.

In this State the statute of limitations, in .the absence of an express provision to the contrary, runs against a municipal corporation.  (p. 14.)

7.      A case in which these principles are discussed and applied.

WARTH & BRIGGS and BROWN, JACKSON & KNIGHT for appellant :

I.— *Where there has been no dedication of street, or it has become the property of the citizen by adversary possession, injunction to restrain town from opening the street is proper.*—15 W. Va. 394 ; 9 W. Va. 215 ; 23 W. Va. 211.

II.— *Where there has been no public use of a street, and town claims dedication, the acts and declarations of owner must clearly manifest an unmistakable intention to permanently abandon his. property for that purpose.*—30 W. Va. 606 ; 9 W. Va. 215.

III.— *The acceptance of dedication must be by the proper authorities.*—44 Mich. 467 ; 7 N. W. Rep. 49.

IV.— *If citizen has held part of a street so long as to bar the better right in ejectment, his title is good to maintain as well as to defend a suit.*—24 Gratt 149 ; 12 W. Va. 36 ; 14 S. E. Rep. 130.

V.— *Injunction will lie to restrain town from opening street against owner's consent until condemnation.*—23 W. Va. 211.

VI.— *When town attempts to open street claiming dedication, burden .of alleging and proving same is on the town.*—23 W. Va. 211.

VII.— *An answer with general replication throws upon defendant burden of proving every affirmative allegation contained in it.*—23 W. Va. 217.

VIII.— *General Rule requires the Court to perpetuate the injunction.*—23 W. Va. 221.

IX.— *Where no objection was taken to the bill on the motion to dissolve, it will be considered sufficient.*—23 W. Va 220.

X.—*The doctrine of estoppel* in pais *applies.*—2 Dill. Mun. Corp. (4th Ed.) 804.

XI.—*In deciding boundaries of lots ancient reputation and possession entitled to more respect than an experimental survey.* 3 Rand. 44.

XII.—*Course and distance yield to natural and ascertained objects.*—2 Lom. Dig. (4th Ed.) 211 (s. p.); 1 Greenl. Ev. (2d. Ed.) 397, 398 (n. 2.); 1 Call 438; 3 Call 339; 4 H. & M. 125; 60 Am. Dec. 726; Id. 274; 77 Am. Dec. 769; 87 Am. Dec. 111; 88 Am. Dec. 696; 8 Am. Dec. 722; 3 W. Va. 148; 32 W. Va. 487.

XIII.—*Disputed boundary may be settled by parol agreement, if executed immediately accompanied with possession.*—32 W. Va. 487; 12 Wend. 127.

XIV.—*Jury may infer such settlement from acquiescence for a less period than is necessary to constitute adverse possession, and also from acts and declarations of the parties.*—64 Mo. 218; 13 Am. Dec. 660; 25 Am. Dec. 452; 67 Am. Dec. 612; 26 Am. Dec. 240; 1 Am. Rep. 298.

XIV.—*An undisputed corresponding line is competent to settle the line in dispute.*—21 N. H. 440.

W. E. CHILTON and O. JOHNSON for appellee:

I.—*The city had authority to remove obstructions from its streets without resorting to ejectment.*—Code c. 47, s. 28; 12 W. Va. 36; 27 W. Va. 681.

II.—*To constitute a possession, which will bar the title to the legal owner of land, it must be adverse, actual, visible and exclusive, continuous and under a claim or colour of title.*— 24 W. Va. 238; 35 W. Va. 578.

III.—*If there is any doubt whether or no there was such adverse possession, decree appealed from must be affirmed.*—27 W. Va. 639; 28 W. Va. 715; 31 W. Va. 137.

IV.—*Can not maintain ejectment.*—33 Mich, 109; 1 Brev. 130; 1 Blackf. 88.

HOLT, JUDGE:

This was an injunction brought in the Circuit Court of Kanawha county by plaintiff, Teass, against the city of St. Albans, to restrain defendant from moving back or

tearing down plaintiff's dwelling-house, claimed by the city to be built about four feet into and on one of its streets. The *ex parte* injunction was granted 24th February, 1892, and on final hearing on April 30, 1892, the injunction was dissolved, and this appeal was granted plaintiff.

The allegations of plaintiff's bill are, in substance, as follows:

Plaintiff, T. A. Teass, is the owner of a lot on the corner of A. street and Smith street, in the city of St. Albans, fronting on A street seventy seven feet, on which is a valuable dwelling-house, built in 1880 or 1881, more than ten years before the institution of this suit; and plaintiff and those under whom he claims have had continuous adverse possession of the dwelling-house and lot for more than ten years, claiming the same as their own under the various deeds and title papers mentioned. The dwelling-house and the lot on which the same is situate, as now fenced and used, are not in part on A street and in no wise obstruct the public use of the street in question. The council of the city of St. Albans, under its charter, has no legal right to enter upon his premises, and take or remove his dwelling-house or fences, without first having the same condemned pursuant to the statute. And, although the city council claims that plaintiff and other owners of the lots are occupying parts of the street, they can only recover the same by proper legal proceedings, when their claim is not admitted but denied by plaintiff and the other owners of the lots.

Plaintiff then charges that the city council have ordered defendant Ed. Wilson, the street-commissioner, to enter upon his premises to remove his fences and his dwelling-house from its present location under the pretended claim that the same are occupying a part of A street of said city; that the street-commissioner claiming to be acting under the orders of the council did with a number of men in the employ of the city enter upon plaintiff's premises on the 23d day of February, 1892, without his consent, pulled down his fence on A street, and is now claiming the right, and declaring the intent, to proceed to execute the order of

the city council, and remove his dwelling-house from its present position under the pretended claim that it is partly in A street;—that such actings and doings are unlawful;—that the injury to him would be irreparable, and not compensable in damages.

The prayer is that the city of St. Albans, the council thereof, the street-commissioner, Wilson, who are made parties defendant, and all agents and employes of the city, be enjoined and restrained from removing plaintiff's dwelling-house, or otherwise interfering in any manner with his said property or any part thereof, situate on said A street, until the further order of the court, and for general relief.

On February 24, 1892, the Circuit Court judge in vacation awarded the injunction prayed for until further order on bond, as required, being given. The bond was given, and summons issued to answer the bill. In term time on April 6, 1892, the defendants appeared by counsel and moved the court to dissolve the injunction; and, it appearing that plaintiff had due notice of the motion, it was set down to be heard on April 8, 1892. The defendants at the same time filed their demurrer to the bill and also their joint and several answer; and the demurrer was set down for argument, and plaintiff replied generally to the answer.

The answer is, in substance, as follows: That the lot of land on A street claimed by plaintiff had long ago been forfeited to the state; that it was forfeited in the name of ———— McDermott, and in the name of Allen M. Smith's heirs, two parties under whom plaintiff claimed, and through whom he derived his supposed title, and that, by reason of such forfeiture, neither Eggleston, plaintiff's immediate vendor, nor plaintiff himself, obtained or had any title. Defendants next gave the history of plaintiff's title as being a part of the "A. M. Smith lands," at St. Albans; —that in the suit of *Hyman, Moses & Co.* v. *A. M. Smith and others*, E. B. Knight, Esq., was appointed a commissioner to sell the Smith lands, and among them a lot bounded on the east by B street, in St. Albans; on the south, by Main street, which is the old James river and Kanawha turnpike, as the same runs through the city of St. Albans; —that, acting under the decree of sale, one P. B. Reynolds,

an engineer, at the instance of Knight, commissioner, to sell, laid off the "Smith block" into streets, alleys, and lots; that Knight, as commissioner, sold the lots as thus laid off, and shown on map made and filed as an exhibit— "Map 1;" that Commissioner Knight sold the subdivided parts of the Smith land here in controversy to one Johnson, Johnson sold to McDermott, McDermott to U. S. Eggleston, and Eggleston to plaintiff; that A street bounding these lots on the west, was laid off by Engineer Reynolds, and that Knight sold these lots, including the one in question, according to the Reynolds map, and dedicated to the public and to the city the said A street, which was soon after accepted by the city of St. Albans, and has ever since been occupied, used and improved by the city as and for a public street and highway for public travel in the city;— that said lots are numbered 21, 22, and 23 on street A, making seventy seven feet, and are called for and described in the deeds of Special Commissioner Knight as lots laid down on the plat of P. B. Reynolds, filed in said court, one of which lots is a part of the real estate belonging to the estate of Allen M. Smith, and fronts twenty seven feet on A street, and runs back a uniform width of twenty seven feet a distance of one hundred and forty four feet, to an alley fifteen feet wide; and so the other two lots, each fronting twenty five feet on A street, and running back one hundred and forty four feet to the alley, being lots No. 21, on the corner of Smith and A streets, twenty seven feet front; No. 22, twenty five feet front; and No. 23, twenty five feet front—all making seventy seven feet front on A street;—and that the lots fronting on B street are one hundred and fifty six feet deep, running back to the same fifteen foot alley; that B street, at its proper width, is forty feet wide, is well located and well known, and had been used and travelled for more than thirty years as a public highway, before the city of St. Albans was incorporated— that the same is a proper landmark, and the proper point from which to start to measure in order to determine the location and position of A street; that it is thus one hundred and forty four feet plus fifteen feet (width of alley) and one hundred and fifty six feet from B street to A

street; that the plat of P. B. Reynolds was made, and said measurements therein, and said lots and alleys were located, by beginning at B street and Main street on the turnpike, and that by beginning at B street, and going east of said lots the proper depth, as called for by said plat and said deeds, and then measuring fifteen feet for an alley, and then measuring on same course out towards Coal river the proper distance called for, as the depth of said lots Nos. 21, 22, and 23, it will leave part of the house now claimed by plaintiff on said A street, one of the public highways of the city, for a distance of about four feet, and that the same constitutes a common and public nuisance to the citizens of the city of St. Albans, and to the public who travel on the street;—that said building does obstruct said street and is about four feet on the same, but that it was not built ten years before these proceedings were begun;—that, if it had been built ten years, the statute of limitations does not apply, for the reason among others that the plaintiff can only claim to the extent of the boundaries named in his deed, or the deeds of those under whom he claims, and that in said deeds these three lots are described as fronting on A street, and that plaintiff can not, by his wrongful and unlawful act, claim more or further than is mentioned in his title papers;—that when plaintiff bought from his vendor, Eggleston, the latter told him, and it was expressly understood between them, that the fence and the house were on A street, and that, if the city should compel plaintiff to remove his house and fence back off the street, Eggleston would allow plaintiff an amount agreed on for making such removal, and that plaintiff took the house and lot with full knowledge that the public and the city had a right to the street to its full width of forty feet, and that the house and fence encroached thereon, and that with such knowledge he can not claim effectually the benefit of the statute of limitations;—that, in order to settle the location of A street, at the instance of the owners on the street the city had a competent surveyor to measure, locate and mark the said street and lots, and report to the city council, and his map and report were made, and are filed as an exhibit;—that plaintiff and his vendor were

notified to appear before the council and show cause, if
any they had, why such obstruction on A street should not
be removed, as a common and public nuisance ;—that plain-
tiff appeared, and the council, after hearing all that was
offered, among other things resolved and ordered that the
said obstruction, consisting of said house and fence, should
be removed, and a copy of the resolution is filed as an ex-
hibit ;—that defendant E. A. Wilson is the superintendent
of roads, streets and alleys of the city of St. Albans.

The defendants charge the house and fence mentioned in
plaintiff's bill to be a common and public nuisance, and
pray the court to remove the same. Defendants admit
that Wilson did attempt to carry out the order of the coun-
cil, and was prevented by plaintiff's injunction, etc.

Two maps, and quite a number of deeds, are filed as ex-
hibits, also the depositions of twelve witnesses, chiefly for
the purpose of showing the true location of A street and of
the lots in controversy.

What is the true location of A street? The deed of
the special commissioner, conveying lot No. 21, takes
for granted the location of A street, as laid down on
the plat of P. B. Reynolds, filed in court, and gives the
location of lot 21 by calling for it to front on A street
twenty seven feet, and to run back a uniform width of
twenty seven feet a distance of one hundred and forty
four feet to an alley. The plat has no note or explana-
tion showing where the survey began, or giving (on the
ground) any direct location of A street. The lot was
never staked off, or in any wise marked on the ground,
but calls for A street, leaving us to find by inferences
more or less remote, as best we may, the location of A
street. It says: "Map of Smith's Block, St. Albans,
Kanawha county, W. Va. P. B. Reynolds, Engr. June
25, 1880. Scale forty eight feet to an inch. The
block is bounded on the west by A street, —— wide ;
on the south by Main street (turnpike) fifty feet wide ;
on the east by B street, forty feet wide ; on the north
by proposed street fifty feet wide." A ten foot alley
runs through from A street to B street, and a fifteen
foot alley through from the proposed street to Main street.

PROPOSED STREET, 50 FEET.

"A" STREET, WIDE. 217 feet.

21 — 27 ft.
22 — 25 ft.
23 — 25 ft.
24 — 25 ft.
25 — 25 ft.
26 — 25 ft.
27 — 25 ft.
28 — 40 ft.

ALLEY 15 FEET WIDE.

20 — 42 ft.
19 — 25 ft.
18 — 25 ft.
17 — 25 ft.
16 — 25 ft.
15 — 25 ft.
14 — 25 ft.
13 — 25 ft.

"B" STREET, 40 FEET WIDE. 217 feet.

ALLEY 10 FEET WIDE.

100 feet.

24 ft 1 | 24 ft 2 | 24 ft 3 | 24 ft 4 | 24 ft 5 | 24 ft 6

24 ft 7 | 24 ft 8 | 24 ft 9 | 24 ft 10 | 24 ft 11 | 24 ft 12

100 feet.

144 feet.    154 feet.

MAIN STREET, (Turnpike,) 50 FEET WIDE.

Map of Smith's block, St. Albans, Kanawha county, W. Va. P. D. Reynolds, Engr., June 25, 1888.

"I certify that the above plat is a true copy of the one on file in E. "B. Knight's office.

"THOS. J. MATTHEWS,
"July 7th, 1890.                                    "Surveyor."

There is nothing to show the course of the streets, but from the evidence I take it that the general bearing of Main street is east and west; and of B street north and south. Reynolds in making his map evidently began at southwest corner of lot No. 1, on Main street. How he determined and fixed that point does not appear, but we may reasonably suppose it was from the corner of Main street and B street, where, on lot No. 12, as laid off by him, an old storehouse then stood. He split up the Smith block into four blocks by running a fifteen foot alley through from south to north, and a ten foot alley from east to west. The evidence shows that but two houses were standing on the Smith block at the time, namely, two old storehouses, one called ——, already mentioned, on lot 12, corner of Main street and B street, and one on lot 6, on Main street, called now "Alford Storehouse."

The witness A. A. Rock was the son-in law and administrator of Allen M. Smith, deceased, and it was at his instance that the commissioner to sell under the decree had the Smith block laid off into lots, and he directed the laying off into lots, made the sales and reported them to the commissioner, who reported them to court and had them confirmed. He instructed Surveyor Reynolds to lay it off, by means of the two alleys and the streets already mentioned, into four blocks, and by his direction the fifteen foot alley began at the east corner of the Alford storehouse, lot No. 6, on Main street, and ran through at a width of fifteen feet to Reynolds's "proposed street," now called "Smith street." The Alford storehouse still stands. It has never been moved, and would seem to determine the point where the fifteen foot alley leaves Main street.

Surveyor Reynolds began at lot No. 1, now called the "McConihay Corner," and, going to the right up Main street, laid off twelve lots one hundred feet deep and fronting on Main street—lots 1, 2, 3, 4, 5, and 6—each twenty four feet wide, making one hundred and forty four feet aggregate front, which brought him to the east or upper corner of the Alford storehouse. Then came the fifteen foot alley. He then marked off lots 7, 8, 9, 10 and 11, each of these also twenty four feet wide, and

lot 12 on the corner of Main and B streets thirty six feet wide. He then ran down B street along lot No. 12, one hundred feet. Here he marked a locust tree as the northern corner of the ten foot alley running through to A street. The stump is shown to be still there. Then along B street beginning at the ten foot alley and the locust tree he laid off, fronting on B street, 8 lots, one hundred and fifty six feet deep, running back to the fifteen foot alley—lots Nos. 13, 14, 15, 16, 17, 18, and 19, twenty five feet wide each and lot 20, on corner of B street and the proposed street, forty two feet wide. Next he passed up the proposed street one hundred and fifty six feet to fifteen foot alley; then, from the alley one hundred and forty four feet to the line of A street. Here, beginning at the corner of the proposed street and A street, he laid off eight lots, one hundred and forty four feet deep, fronting on A street and running back to the fifteen foot alley. The corner lot, No. 21, where the house of plaintiff claimed to be in part on A street stands, is twenty seven feet wide. Nos. 22, 23, 24, 25, 26, and 27 are each twenty five feet wide; and No. 28, forty feet wide. This brought him to the ten foot alley, where it leaves A street, and ten feet across the alley to the rear of lot No. 1, his beginning.

Now, if we begin at the corner of Main street and B street at the street wall on B street of the old building, and measure down Main street, taking the distance, one hundred and seventy one feet, the aggregate fronts of the lots, as called for on Reynolds's map, and the fifteen feet of alley, we are brought to the upper or eastern corner of the Alford storehouse, by which Reynolds was governed in locating the fifteen foot alley.

If we begin, however, at the wall of the present or new building, four feet further west, then the end of the same distance down Main street would put the Alford storehouse four feet on the alley, and the same thing would result at the McConihay corner lot, No. 1. If we begin at the upper corner of the Alford storehouse, as the lower corner of the fifteen foot alley, and run down Main street one hundred and forty four feet, the distance called for, the McConihay building is not in A street; neither is the

building in controversy situate on lot 21, or any part of it in A street.

In other words, the Alford storehouse was the fixed object on the ground by which Surveyor Reynolds was governed in locating the fifteen foot alley, and that, as far as this map and the evidence shows, determines the eastern boundary of A street, as originally located by Surveyor Reynolds. A street is one hundred and forty four feet from the fifteen foot alley, and plaintiff's dwelling house on lots 21, 22, 23, is not in A street, which evidently was supposed to belong, in whole or in part, to the Smith block, when Engineer Reynolds laid it off into lots. The same location of A street would be reached by beginning at the locust tree (now stump) at the post office.

The evidence tends to show that what is called the "Swindler Storehouse," on corner of B street and Main street opposite lot 12, is on the true line of B street, and that B street is forty feet wide. If so, then Surveyor Reynolds made a mistake of four feet in his actual work on the ground, taking what is called the "Old Wall" of the "Teass's Building," on lot No. 12, and the locust tree, as the western line of B street; thus making lot 12 thirty six feet wide, when it should have been but thirty two and making lots from 13 to 20, both inclusive, one hundred and fifty six feet deep, when they are but one hundred and fifty two feet deep. That is, they must stop at the fifteen foot alley, as determined by the Alford storehouse and by the locust tree. But these locations are not intended to be determined, but only used to show that the location of lots 21, 22, and 23 does not depend on the depth of lots 13 to 20, but upon the location, as actually made on the ground, of the fifteen foot alley; for it is a universal rule that course and distance yield to natural and ascertained objects.

But the decisive point in plaintiff's favor is, that the proof fully sustains the allegations of his complaint, "that he and the parties, under whom he claims, have had continuous adverse possession of the land occupied by his dwelling-house and the land inclosed by the fence around the same for more than ten years, claiming the same under their respective deeds and title-papers." Conceding street

A to be where defendants claim it, their right thereto is lost, and plaintiff's title thereto perfected, by ten years' adversary possession. The lots claimed by plaintiff were purchased at a judicial sale in the chancery cause of *Heyman, Moses & Co.* v. *A. M. Smith's Adm'r and others.* The sales were reported and confirmed on the 15th day of March, 1881, and the purchasers put in possession, and in the same year the house in controversy was built or commenced. In 1882 and in 1884, the purchase-money having been paid, the deeds were made by the special commissioner.

The defendants say, in answer to the plaintiff's claim of title perfected by adverse possession, that he can only claim to the extent of the boundaries named in his title-papers, and that actual possession outside his boundaries can not avail, because it wants one of the essential elements. This may be true where the possession is not actual proper but only constructive actual, by reason of the doctrine that possession of a part is possession of the whole, or where his possession is caused by mistake, and there is no intention to set up claim of ownership only to his true line, wherever that may be. But in this case the plaintiff's dwelling-house is on the land in dispute, and he and those, under whom he claims, claim and have claimed ownership, no matter where the true line may turn out to be. So that for both reasons the case of *Hatfield* v. *Workman,* 35 W. Va. 578 (14 S. E. Rep. 153) does not apply. See *Kincheloe* v. *Tracewells,* 11 Gratt. 587; *Jarrett* v. *Stevens,* 36 W. Va. 445 (15 S. E Rep. 177). It is a question of fact and intention, and land may be held in adverse possession, although under a mistake as to his true line. See Buswell on Adverse Possession, section 250 and cases cited. *Burrell* v. *Burrell,* 11 Mass. 294; *Brown* v. *McKinney,* 9 Watts 567; *Clark* v. *Tabor,* 28 Vt. 222; *Robinson* v. *Phillips,* 65 Barb. 418; *Alexander* v. *Wheeler,* 69 Ala. 322. It is one of the objects of the statute to settle disputed boundaries, as well as disputed claims of ownership, regardless of what the true boundary, or the better right, may turn out to be.

Defendants also claim that *bona fides*—good faith—is also one of the essential elements, and that it is wanting here, because these parties knew that they had built the house in

part in A street. It is true it must be *bona fide*, but it is not necessary that the party should believe his claim to be a good and valid one. He may know some other person has the better right. It is not necessary for his claim to be thought good in its inception, for it generally begins in or presuppose wrong, but it must not be fraudulent, or involve any breach of trust; and it is in this sense that the claim must be *bona fide*. See *Swann* v. *Young*, 36 W. Va. 57 (14 S. E. Rep. 426.)

The further point is made that plaintiff's possession was not continuous for ten years prior to the institution of this suit. It is true that for a period of two months during plaintiff's ownership the house was vacant, unoccupied, no one lived in it. Yet that did not constitute any break in the continuity of plaintiff's actual possession. The visible marks of ownership are still there, and there is nothing tending in the slightest degree to raise the presumption of abandonment.

But it is said that the right to the property now claimed by plaintiff was repeatedly disputed during the ten years. Continual or other claim upon or near the land no longer preserves any right of making an entry or bringing an action. Such right of continual claim ceased in July, 1850. See section 2, c. 104, Code W. Va., and Code Va. 1849. Neither does any mere dispute or other thing stop the running of the statute, which does not actually break and interrupt the party's actual possession, and no such interruption appears in this case.

Again, it is contended that there can not be adverse possession of the street in a city or other highway; that the statute does not run, as to such right, against a municipal corporation. But it is settled otherwise in this state. See City of *Wheeling* v. *Campbell*, 12 W. Va. 36, where Judge JOHNSON, after an elaborate examination of authorities, states the law as follows: "The statute of limitations, in the absence of an express provision to the contrary, runs against a municipal corporation the same as against a natural person." The same doctrine is announced in *Taylor* v. *Town of Philippi*, 35 W. Va. 554 (14 S. E. Rep. 130); also, in *City of Richmond* v. *Poe*, 24 Gratt. 149. See

*In re City of Brooklyn*, 73 N. Y. 184; *Village of Olean* v. *Steyner*, 135 N. Y. 341 (32 N. E. Rep. 9). The tendency in this state to end litigation and quiet titles is so strong that, by express provision, "every statute of limitations, unless otherwise expressly provided, shall apply to the state." Section 20, c. 35, Code.

Defendants' next ground of defence is that Eggleston, the plaintiff's vendee, acknowledged in a written paper sent to the council of the city, that he was a trespasser on the street, and that he had so notified plaintiff, Teass, when he sold to him. This paper is as follows: "To the common council of the town of St. Albans: I own lots Nos. 21, 22, and 23, on A street, in the part of the town of St. Albans known as 'Smith's Block,' as laid down on the plat of P. B. Reynolds, which said street is forty feet wide; and I now have before me a copy of said plat, showing said lots and said street and said block. I have given a title-bond to Thomas A. Teass for said lots, and it was the agreement between him and me that my fence on A street stands out six feet on the said A street, and that the same is to be moved back when you get ready and desire to have said removal made; and, in order to save you the trouble of a contemplated suit, I now hereby propose and declare that I will move said fence back six feet, whenever you may demand the same to be done, and I acknowledge that my fence aforesaid encroaches six feet on said street, and to that extent I am a tenant at sufferance of yours. W. S. Eggleston."

Teass bought of Eggleston on November 24, 1891. This paper is not dated, but shows on its face that it was signed after the purchase by Teass. Yet when Eggleston sold to plaintiff, and was showing him the line on A street, he said that, if they (the council) demanded it (the front fence) to be moved, the fence would probably have to be moved. The plaintiff did move back his fence something more than the six feet mentioned in the writing signed by Eggleston, and the present demand is that the front line of plaintiff's lots shall be moved back about nine feet further, requiring a second removal of his fence, and also the removal of his dwelling-house some four feet back. I am unable to see

how the council of the city can claim under and against this paper at one and the same time. If the council accept it as an adjustment of the controversy, then it has been fulfilled on plaintiff's part. If they refuse to accept it, I am unable to see on what ground the council can use it against him. They produce it in evidence, and rely upon it. Are they not, in that event, bound by it?

While on this branch of the subject it is proper, also, to note that it appears in evidence that, in the winter of 1885–86, Eggleston was about to build a new fence in front of his property on A street, and there being some dispute as to the true location of the street, he asked the city council to locate it for him, and thereupon the city council, by its mayor, sergeant and surveyor, located A street in front of his property some fifteen feet further west than is now claimed, and Eggleston built his fence at the place thus shown, and others occupied and improved their lots up to the same line. See *Brooks* v. *Riding* (opinion by Judge Buskirk) 46 Ind. 15, and other cases cited in Dill. Mun. Corp. (4th Ed.) § 675. Disputed boundaries between adjoining lands may be settled by express oral agreement, executed immediately, and accompanied by possession according thereto. *Gwynn* v. *Schwartz*, 32 W. Va. 487, (9 S. E. Rep. 880.) "Courts will not disturb a parol agreement or long acquiescence in a boundary line, but will encourage such settlements of disputed, conflicting or doubtful boundaries, as a means of suppressing spiteful and vaxatious litigation." *McArthur* v. *Henry*, 35 Tex. 801.

In questions of boundary, long and notorious possession authorizes the inference of any fact which can rationally be inferred to make such possession consistent with right. *Norcom* v. *Leary*, 3 Ired. 49 ; *Owen* v. *Bartholomew*, 9 Pick. 520. The known unquestionable monuments of boundary must govern, although neither courses nor distances nor computed contents correspond. *Pernam* v. *Wead*, 6 Mass. 131; *Clements* v. *Kyles*, 13 Gratt. 468–480. Where the boundaries of land described in a survey can not be established by reference to known monuments, and the courses and distances can not be reconciled, there is no universal rule which requires that one of these should

yield to the other; but either may be preferred, as shall best comport with the manifest intention of the parties, and with the circumstances of the case. *Ruffner* v. *Hill*, 31 W. Va. 428-436 (7 S. E. Rep. 13).

In locating lands the following are some of the rules resorted to, and generally in the order stated: (1) Natural boundaries; (2) artificial marks; (3) adjacent boundaries; (4) course and distance—course controlling distance, or distance, course, according to circumstances. Neither rule, however, occupies an inflexible position, for when it is plain that there is a mistake, an inferior means of location may control a higher. *Fulwood* v. *Graham*, 1 Rich. Law, 491.

After Eggleston had built his fence on the line of the street, as located and pointed out as the proper place by the city authorities, and again as an adjustment agreed to by plaintiff after he became owner, another moving back of the fence some six feet or more after this when the city council send their sergeant with a multitude of people to move or tear down over his head his house—which in law is still his castle—plaintiff may well ask, with great force, by what authority they undertake to do this. The reply is that the house is about four feet on the public highway, and therefore constitutes a common and public nuisance, and that they were justified by the law in abating and removing it, as they attempted to do, as set out in their answer: (1) Because their charter and the statute not only authorized, but required it; and we are referred to section 28, c. 47, Code. (2) Because the easement—right of way—on the street is incorporeal, and therefore can not be recovered in an action of ejectment.

Section 28, c. 47, Code, provides, among many other things, as follows: "The council of such city, town, or village shall have power therein to lay off, vacate, close, open, alter, curb, pave, and keep in good repair roads, streets, alleys, sidewalks, crosswalks, drains, and gutters, for the use of the public, or any of the citizens thereof, and to improve and light the same, and have the same kept free from obstructions on or over them; * * * to abate, or cause to be abated, anything which, in the opin-

ion of the majority of the whole council, shall be a nuisance." "But the power to abate nuisances, like all other municipal powers, must be exercised reasonably. * * * It is not unlimited power, and such means, only, are intended as are reasonably necessary for the public good." 1 Dill. Mun. Corp. § 99.

Although this power to abate nuisances may be under a delegation of the police power of the state, yet "the authority to declare what is a nuisance is somewhat broader; but neither this, nor the general authority mentioned in the last preceding sentence, will justify the declaring of acts, avocations, or structures not injurious to health or property to be nuisances. Much must necessarily be left to the discretion of the municipal authorities, and their acts will not be judicially interfered with, unless they are manifestly unreasonable and oppressive, or unwarrantably invade private rights, or clearly transcend the powers granted to them, in which case the contemplated action may be prevented, or the injuries caused redressed, by appropriate suit or proceedings.

"As there is in such cases a judicial remedy in favor of the citizen, so, on principle, the right of the corporate authorities to resort at their election to the courts in proper cases to aid them, when the citizen is in the wrong, should in the author's judgment be also recognized." Id. § 370. The mode of proceeding by indictment, in which conviction may be followed by order of abatement, is well settled. But the remedy in equity, by injunction, is now more usual than any other, and by reason of its great flexibility, unlimited variety of form, and power of adaptation to the exigencies of the particular case, is much more convenient and effective. Nor can I see any good reason why it may not be resorted to by a municipal corporation, where judicial proceedings are proper or necessary. In this state a plaintiff in equity may take issue upon a plea, and have such issue tried by a jury. Section 31, c. 125, Code. So, also, the Circuit Court, wherein is pending a chancery cause, in which there is such a conflict in the evidence as in the opinion of such court to render it proper, may direct an issue thereon to be had in

any such court, or in any other Circuit Court. Section 4, c. 131, Id. See *Earl of Ripon* v. *Hobart*, 3 Mylne & K. 169, Coop. t. Brough. 333; *Flint* v. *Russell* (1879) 5 Dill. 151; 3 Pom. Eq. Jur. § 1349 *et. seq.*, and cases; 16 Am. & Eng. Enc. Law, 959; 2 Story, Eq. Jur. (13th Ed.) §§ 920–924 *et seq.*, notes; 2 Beach, Mod. Eq. Jur. §§ 737–742; Bisp. Eq. § 443. See *Cutting* v. *Carter*, 4 Hen. & M. 424. A municipal corporation can not, by its mere declaration that a structure is a nuisance. subject it to removal. *Yates* v. *Milwaukee*, 10 Wall, 497.

Defendants contend, that an action of ejectment can not be maintained for a right of way, because it is an incorporeal right, citing a number of authorities to that effect. Our present action of ejectment is regulated by statute. See Code (1891) c. 90, s. 1. "The action of ejectment is retained, and may be brought as heretofore, subject to the provisions hereinafter contained. Sec. 2. It may be brought in the same cases in which a writ of right might have been brought, prior to the first day of July in the year eighteen hundred and fifty, in the state of Virginia, and by any persons claiming real estate in fee, for life, or for years, either as heir, devisee, purchaser, or otherwise." By section 4, it may be brought by a person who has a subsisting interest in the premises claimed, or the right to recover the possession thereof, or some interest thereof. By section 23, the verdict of the jury shall be for the plaintiffs, or such of them as appear to have right to the possession of the premises, specifying the estate found for the plaintiff; and by section 29 the judgment for the plaintiff shall be that he recover the possession of the premises according to the verdict of the jury—thus seeming to indicate that possession of the premises may be recovered, and judgment therefor given, according to the plaintiff's right. And why may not the sheriff deliver possession of the street to the city, to be held and used by it as a highway for the public, according to the right? The highway is tangible, although the right or interest is incorporeal. The roadway itself is the object of the incorporeal right of way.

Judge Dillon, in his work on Municipal Corporations (volume 2, 2d Ed., § 662) states the modern doctrine on the

subject as follows: "A municipal corporation, entitled to to the possession and control of streets and public places, may, in its corporate name, recover the same in ejectment, when it possesses the fee, although in trust for public uses. There are no technical obstacles in the way of maintaining such an action against the adjoining proprietor or whoever may wrongfully intrude upon, occupy, or detain the property; and where the adjoining proprietor retains the fee the courts have overcome the technical difficulty by regarding the right to the possession, use, and control of the property by the municipality as a legal, and not a mere equitable, right." See *Herbert* v. *Benson*, 2 La. Ann. 770; *New York El. R'y Cases*, 101 N. Y. 98 (4 N. E. Rep. 536); Elliott Roads & S. 536, 537. The same author lays it down that ejectment lies and is clearly right, upon principle, and is now settled by the great weight of authority, citing Sedg. & W. Tr. Title Land, §§ 132–135 ; *Carpenter* v. *Railroad Co.*, 24 N. Y. 655; *West Covington* v. *Freking*, 8 Bush 121 ; *Read* v. *Leeds*, 19 Conn. 188.

The authorities on the other side are more numerous. Adams. Eject., opens with this statement: "The action of ejectment is a fictitious mode of legal proceeding, by which titles to corporeal hereditaments and titles may be tried, and possession obtained, without the process of a real action. Titles are incorporeal, but the remedy was given by statute." See Tyler, Eject. 37. In *City of Racine* v. *Crotsenberg*, 61 Wis. 481 (21 N. W. Rep. 520) it is held : "A city can not maintain ejectment for a street, the fee of which it does not own." See opinion of LYON, J., who states what may be called the prevailing doctrine on the subject, and in commenting on the Wisconsin statute, which is very much like the statute of this state, says that it does not comprehend incorporeal interests, which lie in grant, and not in livery ; that "there can be no seisin of an incorporeal hereditament, and it can not be the subject of entry or possession." In *City of Grand Rapids* v. *Whittlesey*, 33 Mich. 109, the court holds that a city has not such a valid, subsisting interest in the lands embraced in its streets as will authorize it to maintain ejectment under the Michigan statute. See also *Commissioners* v. *Taylor*, 1 Brev. 129, and *Corner* v. *Trustees*, 1 Blackf. 88.

But it is not necessary, nor is it intended, to decide the question whether an action of ejectment would lie or not. There is little doubt that equity furnishes a plain, adequate and complete remedy.

Plaintiff also claims, that defendant city has no control over A street; that it was never dedicated by the owner to the public, to be used as a street, and was never accepted by the local authorities of St. Albans.

The history of the ownership of A street is as follows: The land seems to have been owned by Phillip R. Thompson. John Thompson, executor, and Sarah Thompson, executrix, of Phillip R. Thompson, by deed dated August 26, 1842, conveyed to Phillip R. Thompson certain real estate, and, as a part thereof, nine lots near Coal river bridge, situated on the turnpike and lane leading to Kanawha river, which lots are known and designated on the plat made by Thomas Matthews, Esq., in the division of the estate of Phillip R. Thompson, Sr., as "Lots Nos. 3, 4, 5, 6, 7, 8, 9, 10 and 22." Phillip R. Thompson and wife, by deed dated 16th October, 1847, conveyed to George Rogers certain lands, and among them said lots Nos. 6, 7, 8, 9, 10 and 22. George Rogers, by deed dated June, 11, 1856, conveyed to Allen M. Smith a certain boundary of land supposed to contain four and a half or five acres lying in the county of Kanawha, on the north side of the turnpike (James river and Kanawha and adjoining Coal river bridge, and bounded by said turnpike, by the lane leading to Kanawha river, by Watson Vickar's lot, and by Coal river to said beginning at said bridge, referring to said Thompson's deed to him as of record. A copy of the Thompson map of lots and streets is in the record, which shows a street on each side of the Smith block. Rogers, in his deed to Smith, ignored the proposed street called "Smith Street," and also the street now called "A Street." The eastern line of this street on the Thompson map is eleven feet west of the eastern line of A street, on the Reynolds map. E. B. Knight, as special commissioner, by deed dated May 24, 1880, conveyed to Mrs. Louise Brooks what is lot 22 on the Thompson map, calling for it to adjoin A street, and run with it *sixty* feet.

If that line of the Brooks lot were prolonged above Smith towards the bridge, it would leave a space or strip *eleven* feet wide between it and the front of plaintiff's house, and would tend to show the east line of A street as laid down on the Thompson map. See *Gibson* v. *Poor*, 1 Fost (N. H.) 441. Therefore this evidence would tend to show that this strip, *eleven* feet wide, belonged to the estate of Allen M. Smith.

The Circuit Court, having decreed the land of Allen M. Smith to be sold to discharge the debts against the estate, in order to make it fetch the best price caused Engineer Reynolds to lay off the Smith block into lots, streets, and alleys, as an addition to the town of St. Albans, and made a map thereof, heretofore referred to as the "Reynolds Map," and sold the lots with reference to such map, and as designated and numbered therein. Such acts furnish *prima facie* evidence of the intent on the part of those having the right to sell to dedicate such streets and alleys to the public, and the proper local authorities of the city of St. Albans afterwards, viz: in 1885, by entry of a formal order accepted such dedication, and have since acted thereon. Such dedication puts the east line of A street one hundred and forty four feet west of the fifteen foot alley, as already located by the Alford storehouse, and explained, and the house of plaintiff is not over on any part of A street. But this acceptance by the city was four or five years after plaintiff's house was built. To that line, one hundred and forty four feet from the alley, he is also protected by the statute of limitations; he and those under whom he claims, having had continuous actual possession for more than ten years, claiming it as their own, under at least a claim of title. Without regard to the lapse of ten years, plaintiff's actual possession of his house is evidence, also, of his right of possession, because it is *prima facie* evidence of his ownership in fee. Therefore, when defendants undertook to move it back, he had, *prima facie*, a perfect title; and the council of St. Albans had no right, by its mere declaration, that the house was a nuisance, to subject it to removal but should first have had the fact determined by some proper judicial proceeding.

For these reasons, the decree of the Circuit Court of Kanawha county, of April 30, 1892, is reversed, and the injunction awarded plaintiff made perpetual up to the east line of A street, as herein ascertained and determined, viz: one hundred and forty four feet west from the east wall of the Alford storehouse, on lot No. 6, as laid down on the Reynolds map.

# CHARLESTON.

