Argued March 18, decided April 7, 1914.

## STROM *v.* HANCOCK LAND CO.

(140 Pac. 458.)

**Adverse Possession—Actual Occupancy—Occupancy by Agent.**

1. Possession by an agent is the possession of the principal, for the purpose of acquiring title by adverse possession, though the principal never personally occupied the land.

[As to right to maintain ejectment against servant or agent in actual possession of premises, see note in Ann. Cas. 1913C, 356.]

Adverse Possession—Exclusiveness of Possession.

2. Where a 100-acre tract inclosed by fence was occupied by an agent for his principal till the principal sold him a seven-acre tract out of it, including the land in dispute, after which he continued to occupy the seven acres as his own land, and the remainder as agent, though for a time the entire 100 acres were inclosed by a common fence and the agent lived on a portion other than that he had purchased, there was no such common or mixed possession by the principal and agent as interrupted the continuity of disseisin of the former owner of the land in dispute.

[As to possession of part as possession of whole, see note in 125 Am. St. Rep. 302.]

From Multnomah: HENRY E. McGINN, Judge.

This is a suit by Gustav Strom against the Hancock Land Company, a corporation, to determine an adverse claim to real property. From a decree for plaintiff, defendant appeals. The facts are set forth in the opinion of the court.          AFFIRMED.

For appellant there was a brief over the name of *Messrs. Malarkey, Seabrook & Dibble,* with an oral argument by *Mr. Ephraim B. Seabrook.*

For respondent there was a brief over the names of *Mr. Albert H. Tanner* and *Mr. John Van Zante,* with an oral argument by *Mr. Tanner.*

Department 1.   MR. JUSTICE RAMSEY delivered the opinion of the court.

On the 22d day of March, 1912, the plaintiff commenced this suit. The complaint alleges that the plaintiff is, and for a long time prior to the date of the commencement of this suit was, the owner in fee simple and in the actual possession of lot No. 1, in block No. 1, in Delmar Shaver's Second Addition to the City of Portland, Multnomah County, Oregon, according to the duly recorded map and plat thereof, The complaint alleges, also, that the defendant has unjustly claimed, and now unjustly claims, an estate or interest in said real property or some part thereof,

adverse to the plaintiff; that the claim of the defendant is without any right whatever; and that the defendant has no estate, right, title or interest whatever in said premises, or in part thereof. The complaint alleges, also, title to said premises in fee under and by virtue of the statute of limitations, for the reason that neither the defendant nor any of its predecessors or grantors have been in possession of said real property within the ten years preceding the commencement of this suit, and that the plaintiff, his grantors and predecessors in title and interest, had been in the actual, open, visible, notorious, continuous, hostile and adverse possession of the above-described property for more than ten years prior to the commencement of this suit, etc. The complaint prays for a decree declaring that the plaintiff is the owner in fee simple of said real premises, and that the defendant has no claim, right, title or interest in or to said real property, or any part thereof, and barring all claim of the defendant in or to said real property, and quieting the plaintiff's title thereto.

The answer denies most of the allegations of the complaint, and pleads title in the defendant as to a part of the real premises described in the complaint.

The reply denied the allegations of the answer. The court below made findings and entered a decree for the plaintiff, as prayed for in the complaint. The defendant appeals, and claims that the findings and the decree of the court below are not supported by the evidence.

The parties stipulated, in the court below, that the plaintiff owns all of the premises described in the complaint lying south of the north line of the donation land claim of William Irving, and that the defendant owns all land lying north of the north line of Delmar Shaver's Second Addition, as shown on the recorded

plat thereof, and, also, that if the north line of the William Irving donation land claim is situated south of the north line of the said Delmar Shaver's Second Addition, then the defendant owns so much of the premises described in the complaint as is north of the north line of the William Irving donation land claim, unless the plaintiff or his predecessors or grantors have acquired title thereto, by adverse possession, in which case said premises are owned by the plaintiff.

The weight of the evidence shows that the north line of the donation land claim of William Irving is about 20 feet south of the north line of the said Second Addition of Delmar Shaver. Hence the further question to be determined is whether the plaintiff, his predecessors and grantors, had had prior to the commencement of this suit the adverse possession of the land now covered by said lot No. 1, of said block No. 1, of Delmar Shaver's Second Addition to the City of Portland, described in the complaint, for the period of at least ten years.

The land in dispute was supposed to be a part of the donation land claim of William Irving and wife. The Delay donation land claim adjoined the Irving claim on the north, and, according to the contention of the plaintiff, the north line of the Delmar Shaver's Second Addition coincided with the north boundary of the Irving claim and the south line of the Delay claim. As stated *supra,* according to recent surveys, it seems that the north line of Delmar Shaver's Second Addition extends about 20 feet north of the north line of the Irving claim, and that about 20 feet of the north part of the property described in the complaint, and claimed by the plaintiff, is situated upon the Delay claim, and that it does not belong to the plaintiff, unless he and his grantors and predecessors

had had adverse possession thereof for at least ten continuous years prior to the commencement of this suit. The plaintiff contends that he and his predecessors in title had been in the adverse possession of said land for more than ten years, and the court below sustained his contention.

Mrs. E. Ryan was one of the witnesses for the plaintiff. She was formerly the wife of Captain William Irving, and he and she settled on the Irving claim and received title thereto as donees under the Donation Law of 1850 (Act Sept. 27, 1850, c. 76, 9 Stat. 496). The land in dispute was supposed to be on that part of said claim set apart by the government to Mrs. Irving. She remembers when the north boundary line of the Irving claim was surveyed. She resided on said claim with her husband, Captain Irving. In 1860 she and Captain Irving moved to British Columbia, and they remained there for years. Mrs. Ryan was acquainted with Joshua Delay, the owner of the Delay claim. Mrs. Ryan says that a fence was built on the line between the Irving and Delay claims about 1870 according to the government survey. She says that that fence was always recognized as the line between the claims. She testified that Irving claimed to own up to that fence. Asked whether Joshua Delay always recognized that fence as the division line between the two claims, she answered, "Yes, they never disputed it." She says that she never heard of Delay's questioning that that fence was on the line. (See Ev., p. 32.)

Mrs. Ryan says that she and Mr. Irving claimed to own the land up to the old fence. (Ev., pp. 31, 32.) She says that she and Irving moved to British Columbia in 1860, and that G. W. Shaver came over in 1860 to look after the land for her, and he looked after her land, including the land in question, and farmed

it, and that there were some fruit trees on it. Mrs.
Ryan says that during the time she resided in British
Columbia she came to Portland every year. She says
that the old fence referred to was a rail fence. She
says, also, on cross-examination, that she remembers
the part of her land that she sold to G. W. Shaver, and
that the fence around her land included the land that
she sold to Shaver, and also other land owned by her.

The patent to the Irvings was issued November 13,
1865.

Mrs. Elizabeth J. Irving (Ryan) conveyed to G. W.
Shaver, on June 16, 1876, seven acres and a fraction
of her part of the Irving claim, and this tract is the
land that was laid out as Delmar Shaver's Second
Addition by G. W. Shaver and wife in 1900, and the
land in dispute is lot No. 1, in block No. 1, in said
addition. When this addition was laid out, G. W.
Shaver believed that all of it was on the Irving claim.

Delmar Shaver, a son of G. W. Shaver, was a wit-
ness for the plaintiff. He was born and reared on the
Irving claim, and lived on it until after he was 23
years old. He lived there with his father G. W.
Shaver, and is familiar with those premises. He says
that the first fence that inclosed the Irving land, on
which his father resided so long, was an old rail fence,
and that when his father bought the seven-acre piece
(in 1876) it, including what his father bought, was
inclosed as one piece, and that the old rail fence was
there then. He says that he does not know when this
old fence was built, but it was there as far back as
he can remember. This witness says that (after his
father bought the seven-acre tract) they built a board
fence on what was supposed to be the line of the old
rail fence, and that the board fence was supposed to
be on the line between the Irving and Delay claims,
and he says that the line where said fence was built,

as he understood it, always had been recognized as the line between said two claims, and that he never heard anything to the contrary, until a few years ago. Asked how long, to his knowledge, the Irving land (on which his father lived) had been fenced all around by a substantial fence, he answered that he was born there, and that it was fenced and inclosed then, and that they always had it for pasture and for an orchard, and he testified (Ev., p. 23) that his father always claimed up to the old fence line, and that his father cleared the ground up to that line. He says they used part of the land, and had a big orchard. On cross-examination, he testified that, before his father bought said seven-acre tract of Mrs. Irving, there was a rail fence entirely around it; but he said, also, that the fence inclosed other lands besides what his father bought. He says that he helped build the board fence, but that the board fence itself did not go around the whole piece, and that it connected with the old rail fence, and that the board fence on the north line was built along the line of the rail fence. He says that his father had the seven-acre tract inclosed with Mr. Ryan's property. He says that all of the property was inclosed when his father bought the seven-acre tract, and that his father took care of Mrs. Ryan's property and lived on it until his death. He says that the inclosure included more than 100 acres of land belonging to Mrs. Ryan, and what she sold to his father, and that his father raised wheat and oats on this land and had a large orchard. He says that his father did not reside on the piece that he bought of Mrs. Ryan, but on the part that she did not sell to him. It appears that G. W. Shaver lived on this property from about 1860 until his death, a period of about 40 years, and took care of it for Mrs. Ryan, as her agent.

It is impracticable to set out a summary of all the material evidence. There were three other witnesses for the plaintiff.

The defendant did not offer any evidence on the subject of adverse possession. It put a witness on the stand to prove that the 20-foot strip in dispute was not in the Irving claim, and rested. Hence the question as to adverse possession must be determined on the evidence produced by the plaintiff.

The defendant in its brief gives a summary of the facts as shown by the evidence as it viewed them: (a) It admits that Mrs. Ryan, as early as 1872, had a rail fence built, inclosing about 100 acres of her land, and that during that time, and for many years afterward, G. W. Shaver, as agent of Mrs. Ryan, was in possession of this 100 acres, so inclosed, and that this fence was built as early as 1872, and did inclose that part of the Delay claim that is in dispute in this suit. The evidence shows that this fence was built in 1870, and that it inclosed the land in dispute, and that G. W. Shaver, as agent of Mrs. Ryan, lived on this 100-acre tract continuously from 1870 until his death in 1901, about 30 years. Shaver raised wheat, oats and fruit on said land. The inclosure appears to have been an ordinary rail fence. (b) The defendant admits, also, that Mrs. Ryan in 1876 sold and conveyed seven acres within said 100-acre inclosure to G. W. Shaver and described said parcel in said conveyance by metes and bounds. The defendant claims that this deed did not describe any part of the small strip in dispute, and this contention seems to be true; but the evidence shows that that conveyance included the land running up to the north line of the Irving claim, and that both Mrs. Ryan and G. W. Shaver believed and understood that it did include the land in dispute, and that both Mrs. Ryan and G. W. Shaver claimed the land up to the

said old rail fence which the defendant admits, and the evidence shows, included the strip in dispute. The evidence shows that, prior to the execution of said deed, G. W. Shaver held and had possession of said land for Mrs. Ryan as her agent, and, from the date of said deed until his death, he held said seven-acre tract as the owner thereof, and not as agent for Mrs. Ryan; but he held the remainder of said tract as her agent until his death. (c) The defendant claims that Mrs. Ryan resided in British Columbia for many years and did not reside on said 100-acre tract; but that it was inclosed with a rail fence in 1872, and from that time on she had G. W. Shaver in the possession of said land as her agent, and that he held it for her. The evidence shows that he was in the actual possession of all of said 100-acre tract all of said time as her agent. His possession was her possession. The defendant admits an adverse possession in G. W. Shaver from 1897 until about 1901, and admits that the plaintiff had adverse possession of the premises during the seven years prior to the commencement of this suit, but claims that there was a breach of several years in the possession between the possession of G. W. Shaver, and that of the plaintiff, and that the plaintiff cannot add to his possession that of any of his predecessors. (d) The defendant admits that the 100-acre tract, including the strip in dispute, was inclosed with a fence from 1872 until the death of G. W. Shaver, about 1901. We think that the fence was built about 1870, and that the inclosure and possession continued until G. W. Shaver's death and beyond that date, but we will call it a period of 30 years. All of the 100-acre tract, including the tract in dispute, was inclosed with a substantial fence. The sufficiency of the fence has not been questioned.

The defendant, commenting on this possession, says, in its brief:

"Shaver extended her [Mrs. Ryan's] fence over the line between her land and Delay's. This was without color of title, and, to be adverse, possession must be actual occupancy. The occupancy of Shaver was not her occupancy because she herself had not taken actual possession, and then put Shaver in. possession, but Shaver took possession for her. This cannot be done. Disseisin cannot be accomplished by an agent or tenant."

1. The counsel for the defendant seems to think if Shaver had been acting for himself, and not for Mrs. Ryan, his possession might have been sufficient to constitute adverse possession; but inasmuch as he was acting for her, as her agent, his possession was not her possession sufficiently to constitute adverse possession on her part. In this we cannot agree with counsel. Shaver was the agent of Mrs. Ryan and acted for her. What she did by him she did herself. She caused him to erect the fence inclosing the 100 acres, including the land in dispute, and when this was done, by her authority, and she claimed to, own all of the land inclosed as her land, such acts constituted a disseisin of the defendant's grantors as to the land in dispute.

·1·Cyc., page 996, says:

"The possession of one's agent is, for the purpose of acquiring title by adverse possession, the possession of the principal."

In *Lantry* v. *Parker,* 37 Neb. 353 (55 N. W. 962), the syllabus is as follows:

"One may plead adverse possession and is entitled to the benefit of the statute relating thereto, although he was a nonresident and absent from the state during a portion or all of the period covered by his possession. The possession of one's agents is, for the purpose of

the statute of limitations, the possession of the principal.''

In *Den ex dem. Roberts* v. *Moore,* 3 Wall. Jr. 298 (Fed. Cas. No. 11,905), Justice GRIER says:

''I think, also, the 30 years' limitation applies to this case. Possession by an agent or manager is actual possession within the meaning of the statute (of limitations).''

31 Cyc. 1405 says:

''If an agent is in possession of the principal's property, by authority of the principal, possession of the agent is the possession of the principal, and will authorize the agent to maintain against third persons possessory actions with reference to the property.''

In *Cochrane* v. *Faris,* 18 Tex. 857, the court says:

''The possession of the tenants and agent of Riley was the possession of Riley. The land must be used and cultivated, but whether this be done by Riley or his tenants or agent, those holding under him, was immaterial.''

In *Whithead* v. *Foley,* 28 Tex. 14, the court says:

''In answer to the third objection made to the defense relied upon by this defendant, it may be said that, although it is unquestionably true that the party who seeks to protect himself under this section of the statute must show that he has title or color of title, as defined by the law, or holds by chain of transfer, * * has possession of the land in dispute, and that the same has been held adversely to the plaintiff during the time prescribed, yet there is nothing which defines or limits the manner in which he must hold possession, or forbids him claiming the benefit, when held in any manner recognized by law, as sufficient to invest him with actual seisin and possession of the land. It is immaterial whether he does so by actual individual occupancy, or by a servant, agent, or attorney.''

In *McColman* v. *Wilkes,* 3 Strob. (S. C.) 470 (51 Am. Dec. 638, 639), the court says:

"The persons who held the land for the plaintiff were rather agents than tenants, or if tenants they were not lessees of a particular parcel, but tenants employed to hold possession of the whole. * * The possession of such a tenant or agent is the possession of the person under whom he holds, as much as would be an occupation of that person's overseer and slaves or cropper and hirelings": See, also, *Goodwin* v. *Sawyer,* 33 Me. 541.

It is held, also, that, where the owner has been disseised, he can re-enter upon the premises by an agent, and by such re-entry toll the statute of limitations: *Campbell* v. *Wallace,* 12 N. H. 367 (37 Am. Dec. 219); *Ingersoll* v. *Lewis,* 11 Pa. 219 (51 Am. Dec. 536); *Hinman* v. *Cranmer,* 9 Pa. 41.

2. We find from the evidence that from 1870 or 1872, when the 100-acre tract was inclosed with the rail fence, until 1876, Mrs. Ryan, the predecessor of the plaintiff, by her agent, G. W. Shaver, had the actual, open, notorious, continuous, exclusive, and adverse possession of the whole of said 100-acre tract of land, including the strip of land in dispute. G. W. Shaver, from 1870 to 1876, when Mrs. Irving deeded the seven-acre tract to him, held the possession of the whole of the 100-acre tract, as agent of Mrs. Irving; but from June 16, 1876, until his death, he held the seven-acre tract in his own right, and had the actual, open, exclusive and continuous possession of said tract from the date of said deed until his death, about 1901.

Mrs. Irving had no kind of possession of said seven-acre tract after she made said deed, and she recognized the title of said Shaver thereto. Some time after said deed was made, Shaver fenced his seven-acre tract off from Mrs. Irving's land; but, during

part of the time after the execution of said deed, said seven-acre tract continued to be inclosed by the same fence that inclosed the remainder of said 100-acre tract belonging to Mrs. Irving. Said seven-acre tract was inclosed by a substantial fence from 1870 or 1872 until about 1901—a period of about 30 years—and neither the defendant nor any of its predecessors had possession of any part thereof at any time during said period of 30 years. The inclosure of the 100-acre tract in 1870 or 1872, and the claim of Mrs. Irving to own the whole thereof, and the actual occupancy thereof by her agent and his family, as stated *supra,* under a claim of title, operated as a disseisin of the defendant's predecessors, and this disseisin continued until the death of Shaver, and the title of G. W. Shaver to the seven-acre tract became vested in him in fee by the adverse possession of Mrs. Irving and the adverse of himself as early as 1882.

It is true that Shaver did not live on the seven-acre tract, but he resided on Mrs. Irving's remaining portion of the 100-acre tract. However, he had actual possession of the seven-acre tract, and, as testified by his son, he cultivated part of it and used other parts for pasture, etc. Before he fenced it off from Mrs. Irving's land, it was completely inclosed by her fence as it had been since 1870 or 1872. G. W. Shaver had the possession and use of Mrs. Irving's land by her authority, at all times from 1870 or 1872 until after he fenced the seven-acre tract from her land, and he continued to use her fence to inclose his said land, with her consent, until he fenced his land off from hers. Mrs. Irving did not have or claim to have any kind of possession of Shaver's land after she deeded it to him as stated *supra.*

Shaver and Mrs. Irving had no common possession of the land in dispute. She neither had, nor claimed

70 Or.—8

to have, any rights therein after she made the deed to
Shaver. The fact that their lands were inclosed by a
common inclosure for a short time did not destroy the
adverse character of the possession of the seven-acre
tract including the land in dispute.

In *Parker* v. *Newberry,* 83 Tex. 431 (18 S. W. 817),
the court says:

"Beaseley sold it [land] in March, 1886, to appellee,
who went into possession. If he was in possession up
to the sale by Beaseley, and appellee's possession
commenced with that sale, the continuity of the posses-
sion was clearly unbroken. The fact that the parties
may have been in possession of the separate tracts of
land included within the fence [or inclosure], and that
their stock may have grazed on the land of appellee,
and a concurrent use of the same by others, would not
militate against the exclusiveness, in a legal sense, of
his possession, nor make it the less adverse in its char-
acter. Especially is this so where that use or concur-
rent enjoyment of it by others was in subordination to
appellee."

1 Cyc. 990 says:

"In New York it has been held that, although a
claimant may avail himself of a fence upon the line to
complete his inclosure, the statute does not contem-
plate that a fence located far away from the premises
and including other lands should be used as a means
of protection to a claim by adverse possession. In
other states the fact that land other than that claimed
by adverse possession was embraced within the in-
closure does not seem to affect its sufficiency if the
whole tract inclosed was occupied and claimed for the
statutory period."

In *Ambrose* v. *Huntington,* 34 Or. 487 (56 Pac. 513),
the court says:

"At some points it [the fence] was constructed
somewhat off the line, and included some three acres
of railroad land, and five or six acres of land belonging

to Mr. Long.   This fact, however, is not material, as
the other land inclosed was inconsiderable, and the
fencing may be said to have been placed substantially
upon the boundary line," etc.

In *Hamilton* v. *Fluornoy,* 44 Or. 102 (74 Pac. 485),
the court says:

"The inclosure relied upon was common to him and
to others owning lands within its limits, and the use
which consisted wholly of pasturage of stock was com-
mon as to all, so that his possession was neither
actual, nor exclusive, and was therefore wanting in
these essential elements to adverse possession, such as
will ripen into a full title."

In the quotation from 1 Cyc., *supra,* reference is
made to what was held in New York, and that work
refers to the case of *Doolittle* v. *Fice,* 41 Barb. 181,
which is based on a New York statute requiring that,
to constitute adverse possession, the claimant's land
must have been protected by a substantial inclosure,
and the facts of that case are different from the facts
of this case.

We have examined the cases cited by the appellant
and many others; but we have found no case where
the facts are similar to the facts in this case where it
was held that a claim of adverse possession was not
made out.

In this case Mrs. Irving held the possession by G. W.
Shaver, her agent, from about 1870 until June, 1876,
and at the last-named date she conveyed the premises
in dispute to her agent, and he continued from that
date to occupy the remainder of her premises until
about 1901, and, from the date of said deed until his
death, he held the premises described in the deed and
the premises in dispute as his own property.   There
was no mixed possession.   Mrs. Irving neither had nor
claimed to have any possession of the seven-acre tract

after the date of said deed, and no one possessed any part of said tract after said deed was made, during the life of Shaver, but him.

While said seven-acre tract was inclosed by the same fence that inclosed the remaining land of Mrs. Irving's, for a while after said deed was made, yet G. W. Shaver, the grantee of said seven-acre tract, remained until his death in the actual possession of the remainder of Mrs. Irving's land. He had the continuous possession of her land as her agent and of the seven-acre tract as owner thereof.

Every case of adverse possession must be decided on its own facts.

We find that the plaintiff is the owner of the premises described in the complaint, and we approve the findings and the decree of the court below. The decree of the court below is affirmed.    AFFIRMED.

Mr. Justice Moore, Mr. Justice Burnett and Mr. Justice Bean concur. Mr. Chief Justice McBride not sitting.