## ABEL ET AL. v. LOVE ET AL.

[No. 11,817.    Filed April 3, 1924.]

1. ADVERSE POSSESSION.—*Defined.*—Adverse possession is defined to be such use of property as the owner himself would exercise, disregarding the claims of others entirely, asking permission from no one, and using the property under a claim of right; the possession must be actual, open, notorious, exclusive, continuous and under a claim of right.    p. 336.

2. ADVERSE POSSESSION.—*Elements of.*—There are five indispensable elements in adverse possession, namely, (1) it must be hostile and under a claim of right; (2) it must be actual; (3) it must be open and notorious; (4) it must be exclusive; (5) it must be continuous.    p. 336.

3. ADVERSE POSSESSION.—*Hostile Claim of Ownership.—Evidence.*—Possession of land by another than the owner of the legal title which comports with ordinary management of similar lands by their owners furnishes satisfactory evidence that the possession is hostile to the owner of the legal title.    p. 337.

4. ADVERSE POSSESSION.—*Evidence of Ouster of the Owner.— What Sufficient.*—Where visible acts of ownership have been done upon the land which, from their nature, indicate a claim of ownership thereof, and are continued sufficiently long, with the knowledge of the holder of the legal title, without interruption or adverse entry by him, such acts are evidence of an ouster.    p. 337.

5. ADVERSE POSSESSION.—*Oral Declarations of "Claim of Right" Unnecessary.*—An oral declaration of a "claim of right" to the land is unnecessary, as such claim may be inferred from the manner of the occupancy, and may be shown by positive acts of ownership, inconsistent with the title of the true owner of the land, such as erecting, repairing and occupying buildings, the building and repairing of fences thereon, leasing the property and collecting rents.    p. 337.

6. ADVERSE POSSESSION.—*Intention to Appropriate Land.—When Presumed.*—The hostile intent of a party in possession of land belonging to another is generally evidenced by the character of his possession and acts of ownership, and when these are sufficiently definite, open and exclusive, it will be presumed that they are done with the intent to appropriate the land, as, by such acts, the party proclaims to the public that he asserts exclusive ownership over the land.    p. 339.

7. ADVERSE POSSESSION.—*Acts of Ownership by One in Possession.—Presumption.*—Where one is shown to have been in possession of land for the period of limitation, apparently as

Abel *v.* Love—81 Ind. App. 328.

owner, and such possession is not explained or otherwise accounted for, it will be presumed to· have been adverse; such presumption being a rebuttable one by proof that the original possession was permissive and not adverse. p. 339.

8. PROPERTY.—*Evidence of Title.—Possession.—Presumption.*—Possession alone, with claim of ownership, is itself title of low degree, and one in possession of property is presumed to be the owner of it. p. 342.

9. ADVERSE POSSESSION.—*Difference Between Prescription and Limitation.*—Prescription rests upon the presumption of a past grant, inferred from and ·evidenced by an adverse enjoyment for a period fixed by law, while the doctrine of limitations, on the other hand, rests upon no such presumption of a right or title in one other than the true owner of the land; on the contrary, it assumes the.title to be in the latter, but refuses to allow him to assert it because of his want of possession. p. 342.

10. ADVERSE POSSESSION.—*Limitation of Action.—Evidence.—Weight.*—While the acts of a party claiming title by reason of the running of the statute of limitations are to be strictly construed, his acts, when specially found or proved by undisputed evidence, are given the same legal effect and weight as are given to facts in any other kind of action. p. 343.

11. ADVERSE POSSESSION.—*Explanation of Possession.—Burden of Proof.*—Possession of land for the period of limitation may be explained, but it must be done by the party seeking to disturb the effect of possession. p. 345.

12. ADVERSE POSSESSION.—*Manner of Holding.—Occupation by Tenants.*—Adverse possession may be kept up without the personal occupancy of the disseizor, occupancy by tenants being sufficient where the disseizor puts them in possession and collects rent from them, claiming the land as his own. p. 345.

13. VENDOR AND PURCHASER.—*Innocent Purchaser.—Notice of Adverse Holding.*—Where the purchasers of a lot and their grantor knew, at the time of purchase, that the owner of the adjoining lot was in possession of a 2½ foot strip thereof, but made no inquiry to ascertain what interest he was claiming therein, they bought the lot at their peril and could not claim to be innocent purchasers as against the party in possession of said strip under a claim of ownership, especially when their grantor furnished them an abstract of title which showed that he did not own the strip. p. 346.

14. ADVERSE POSSESSION.—*Evidence.—Sufficient to Establish Title.*—Possession for the period of limitation of a 2½ foot strip off the side of a lot in a city subdivision, which is shown by uncontradicted evidence to have been actual, visible, notori-

ous, exclusive, under claim of ownership, and hostile to the owner of the legal title, is sufficient to create title to said strip in the one holding possession.    p. 347.

From Marion Circuit Court (35,875); *Harry O. Chamberlain*, Judge.

Action by Martha C. Watson Abel and husband against Bynard B. Love and another. From a judgment for defendants, the plaintiffs appeal. *Reversed.*

*Florea & Seidensticker*, for appellants.
*David A. Myers*, for appellees.

McMAHAN, J.—Complaint by appellant Mrs. Abel, her husband joining, in ejectment and to quiet title to a strip of land about two and one-half feet wide off the north side of lot No. 62 in Shoemaker and Lippencott's addition to Indianapolis. Cross-complaint by appellees to quiet their title to the same land. Decree for appellees quieting their title.

The errors relate to the overruling of appellants' motion for a new trial, the contention being that the decision of the court:    (1) is not sustained by the evidence; and (2) that it is contrary to law.

The facts as shown by the undisputed evidence are in substance as follows: on May 20, 1873, Shoemaker and Lippencott, being the owners of a certain tract of land of which the property now in controversy is a part, made a subdivision of the same and recorded the plat thereof in the recorder's office of Marion County. Lippencott conveyed his interest in lots Nos. 62, 63 and 64 of said subdivision to Shoemaker. By *mesne* conveyances, title to lots Nos. 63 and 64 was vested in the Phoenix Mutual Life Insurance Company February 5, 1883. The insurance company sold these two lots to appellant, October 28, 1907, the deed being made to appellant's mother, Emma J. Birge, who, on December 2, 1907, conveyed them to the appellant. Shoemaker con-

veyed lot No. 62 to David Frantz and wife May 27, 1874. By partition proceedings between the heirs of David Frantz, lot No. 62 was set off to Mary M. Merke, in August, 1907. May 21, 1908, Mrs. Merke conveyed all of lot No. 62, except two and one-half feet off the north side thereof, to Richard H. Andrew, who May 27, 1920, executed to appellees a deed for the whole of said lot. On June 7, 1922, Mrs. Merke having died, her heirs, by quit claim deed, conveyed the north two and one-half feet of said lot, that being the land in controversy, to appellees.

When this action was commenced, appellant was the holder of the record title to lots Nos. 63 and 64 and appellees were the holders of the record title to lot No. 62. Lots Nos. 62 and 63 are each forty feet wide and 150 feet deep. The plat shows lot No. 64 to have a frontage of 24.6 feet, when, as a matter of fact, it has a frontage of 34.6 feet. The two and one-half foot strip in controversy has been separated from the remaining part of lot No. 62 by a fence from 1885 to the latter part of June, 1922, when the fence was removed by appellees. There has been a house and barn on lots Nos. 63 and 64 since 1885, the barn being on the east part of lot No. 64 next to the alley, while the house was on lot No. 63. There is a bay window on the south side of the house. This window is about eighteen inches north of the true line between lots Nos. 62 and 63, and about four feet from the old fence. The evidence does not show when the house and barn or the fence enclosing the property were first erected, but it does disclose that they were there in 1885, and from that time until the last of June, 1922, the north two and one-half feet of the lot No. 62 was enclosed by a fence along with lots Nos. 63 and 64, and the two and one-half foot strip of land was used and occupied openly, notoriously, exclusively and continuously from 1885 to June, 1922, by

those in possession of lots Nos. 63 and 64. The east end of the two and one-half foot strip was a part of the garden, the balance of it being a part of the yard which was used by those who occupied said two lots. From 1885 and 1907 lots Nos. 63 and 64 and the land in controversy were in possession of, and used by tenants of the insurance company, the then owner. Mrs. Abel took possession of lots Nos. 63 and 64 and the north two and one-half foot strip of lot No. 62 immediately after the execution of the deed from the insurance company to her mother, on October 28, 1907, and from that time until the last of June, 1922, she was in open, notorious, visible, exclusive and continuous possession of the same claiming to be the owner thereof. When Mrs. Abel purchased the property and took possession of it in 1907, she did so with the understanding and belief that her grantor was the owner of all the land north of the fence and that she by her purchase became the owner thereof. When Mr. Andrew purchased the south part of lot No. 62, in 1908, he knew Mrs. Abel was in possession of the two and one-half feet, and later stated that he got a reduction in price because his grantor could only give title to 37½ feet. The real estate agent who sold the 37½ feet to Mr. Andrew wanted to buy the two and one-half foot strip from Mrs. Abel at that time. The part of lot No. 62 purchased by Mr. Andrew was unimproved and vacant from 1885 until the summer of 1908 when he built a house on it, with a bay window on the north, the roof of which extended over the two and one-half foot strip about five inches.

In 1910, Mr. Andrew rebuilt the fence on the line where it formerly stood using the old material fit for use, taking out old posts and putting in new ones where necessary.

The testimony of two witnesses is that when they moved to the neighborhood of this property in 1885,

there was a house on lot No. 63 and a fence about four feet south of the house extending from the front of the lot back to the alley; that lots Nos. 63, 64 and the two and one-half feet in controversy were at that time enclosed by fences, and that the fence on the south side of the house was maintained and remained in the same place from that time until it was removed by appellees in 1922. These witnesses also testified that lots Nos. 63, 64 and the strip in question were occupied by tenants of the insurance company from 1885 to the time when appellant purchased and moved into the house.

Mrs. Simmons who was a tenant of the insurance company, testified that she lived in the property from 1899 until 1907, when Mrs. Abel purchased it and took possession; that the fence was there when she lived there; that it was about four feet from the bay window on the south side of the house; that she used the two and one-half foot strip on the south side of the house openly and notoriously the same as they did the rest of the property, and while living there they repaired the old fence by putting in new posts; that they used this strip as a part of the property they had rented, without asking permission from anyone.

In May, 1922, a controversy arose between appellant and appellees concerning the rebuilding of the old fence. There is some conflict as to what was said by Mrs. Abel and Mr. Love at that time. Mrs. Abel testified that the fence was in need of repair and that Mr. Love said he would do the work if she would furnish the posts; that, at that time, he said, "You know that fence is on my lot over two feet," and that she replied, "Yes, I know all about where the fence is"; that Mr. Love said there will never be any trouble about it; that he would rather give another foot, and that she said she would get the material with which to repair the fence.

Mr. Love in testifying concerning this conversation

said he talked with Mrs. Abel about repairing the fence and told her he could do the work better than he could afford to buy the material; that she said Mr. Abel had plenty of material and that he would talk to Mr. Love about it, and that he, Love said, "So long as we are going to rebuild this fence, let's put it on the line where it belongs"; that she said it was on the line, and that he in reply said, not according to his papers.

A few days after this conversation, appellees employed a surveyor, had the true line between lots Nos. 62 and 63 located, tore down the old fence and rebuilt it from the alley to a point near the bay window of appellant's house. The fence as rebuilt is on the line between lots Nos. 62 and 63 and is about two and one-half feet north of where the old fence was and if extended to the west end of the lot would leave a space of 18 inches, between the bay window of appellant's house and fence. Before the fence was torn down and rebuilt, there was plenty of room between appellant's house and the fence for one to pass, but one cannot now conveniently do so.

Appellant contends, that, under the undisputed facts, she is the owner of the two and one-half foot strip by virtue of possession and the statute of limitations. Appellees concede that the evidence shows appellant has been in possession of the property claiming to own it since 1907, a period of fifteen years, but insist there is no evidence that appellant's grantor, the insurance company, was in possession of the property prior to that time or that it ever claimed to own the land in controversy. The testimony of the several witnesses as to possession of the two and one-half foot strip by appellant and by the tenants of the insurance company since 1885, stands uncontradicted and unimpeached and must be accepted as being true.

Appellees contend that the insurance company being

a foreign corporation could not have been in "notorious possession" of the real estate in question; that there is no evidence that it ever had possession of the strip in controversy—and that the failure of the evidence to show possession in the insurance company under claim of title bars a recovery on behalf of appellant.

There is no evidence showing the insurance company was a foreign corporation, and if it were, we know of no reason why it could not have held possession of real estate in this state the same as a corporation organized under the laws of this state. In view of appellees' concession relative to the possession of appellant since October, 1907, the only question for our consideration is, Does the evidence, without conflict, show possession of the two and one-half foot strip by appellant's grantor, the insurance company, under claim of ownership up to the time it conveyed lots Nos. 63 and 64 to appellant? Appellees make no claim that Mrs. Simmons was not in open, visible, notorious, exclusive and continuous possession of the land in question as tenant of the insurance company from 1899 to October, 1907, when appellant took possession. The testimony of Mrs. Simmons heretofore referred to was that, as tenant, she used and occupied lots Nos. 63 and 64 and the two and one-half feet in controversy, from 1899 to the time appellant took possession in 1907. Not only is this testimony undisputed but it was corroborated by other witnesses. The undisputed evidence conclusively shows that for more than a third of a century, the land in controversy has been enclosed by a fence with lots Nos. 63 and 64; that, during all of that time, it has been used and occupied by the owners thereof—either in person or by tenants—openly and notoriously without regard to claim of others, and without asking for or obtaining permission from any one. If, from the evidence, it follows as a matter of law

that the possession was adverse and under claim of right, it follows that such possession took the place of a grant and conferred title in appellant.

Adverse use has been defined to be such a use of property as the owner himself would exercise, disregarding the claims of others entirely, asking permission from no one, and using the property under a claim of right. *Nowlin* v. *Whipple* (1889), 120 Ind. 596; *Dyer* v. *Eldridge* (1894), 136 Ind. 654. To be adverse, possession must be actual, open, notorious, exclusive, continuous and under a claim of right. *Rennert* v. *Shirk* (1904), 163 Ind. 542; *Worthley* v. *Burbanks* (1897), 146 Ind. 534; *Webb* v. *Rhodes* (1901), 28 Ind. App. 393; *Philbin* v. *Carr* (1920), 75 Ind. App. 560.

As was said in the case last cited, at page 582, "While the rule is not always stated in exactly the same words in all the thousands of cases dealing with this subject, nevertheless the rule is so thoroughly settled that there is no justification for the existence of a doubt as to what elements are essential to raise up a title by adverse possession."

It was there held that possession to be adverse must be "actual, visible, notorious, exclusive, under claim of ownership and hostile to the owner of the legal title and continuous for the full period prescribed by the statute." There are five indispensable elements in adverse possession, namely: (1) It must be hostile and under claim of right; (2) it must be actual; (3) it must be open and notorious; (4) it must be exclusive; and (5) it must be continuous. *Lake Erie, etc., R. Co.* v. *Wynn* (1920), 73 Ind. App. 266; *Burcham* v. *Roach* (1919), 71 Ind. App. 669. Using the rule here announced as a yardstick, let us now measure the undisputed facts as disclosed by the evidence. The possession of appellant and her immediate grantors was

actual. It was visible. It was open and notorious. It was exclusive. It continued for more than twenty years, and if it can be said to have been hostile to the owner of the legal title, all elements necessary to raise up a title by adverse possession are present.

"If this possession comports with ordinary management of similar lands by their owners, it furnishes satisfactory evidence of adverse occupation." *Clark* 3, 4. v. *Potter* (1876), 32 Ohio St. 49. In other words, to constitute an adverse possession, it suffices for the purpose that visible and notorious acts of ownership are exercised over the premises in controversy for the time limited by statute. And it may be safely said that where visible acts of ownership have been done upon the land which, from their nature, indicate a claim of ownership of the property and are continued sufficiently long, with the knowledge of the holder of the legal title, without interruption or adverse entry by him, such acts are evidence of an ouster.

"Whenever the possession is of a such a character that ownership may be inferred therefrom, then the possession ordinarily may be presumed to be hostile to the rights of the true owner; that is, if a party places permanent structures upon the land belonging to another, and uses the land and structures the same as an owner ordinarily uses his land, then, in the absence of something showing a contrary intention, a claim of ownership may be inferred in favor of the party in possession." *Pioneer, etc., Co.* v. *Board of Education* (1909), 35 Utah 1, 99 Pac. 150, 136 Am. St. 1016, 1019.

It being conceded that appellant has been in possession of the strip of land in question, under claim of ownership, since October, 1907, we need only consider the evidence as to possession prior to that 5. time and the law applicable to the facts as dis-

closed by the uncontradicted evidence. It is not necessary that appellant and those through whom she claims, or any of them, should have ever made oral declarations of a "claim of right." Such claim may be inferred from the manner of the occupancy. It may be shown by positive acts of ownership, inconsistent with the title of the true owner of the real estate in controversy, such as erecting, repairing and occupying buildings, the building and repairing of fences on the real estate, leasing the property and collecting rents. *Rennert* v. *Shirk, supra.*

It is said in *Dyer* v. *Eldridge, supra,* at page 659: "Exercising that dominion over the thing used, taking that use and profit it is capable of yielding in its present condition, such acts being so repeated as to show that they are done in the character of owner, and not of an occasional trespasser, constitute adverse possession. *Baum* v. *Currituck, etc., Club,* 2 S. E. Rep. 673. The correct doctrine is declared in *La Frombois* v. *Jackson* (1826), 8 Cowen 589 as follows: 'The actual possession and improvement of the premises, as owners are accustomed to possess and improve their estate, without any payment of rent, or recognition of title in another, or disavowal of a title in himself, will, in the absence of all other evidence, be sufficient to raise a presumption of his entry and holding as absolute owner; and unless rebutted by other evidence, will establish the fact of claim of title.'" In *La Frombois* v. *Jackson, supra,* the court further said: "Every possession, then, is adverse, and entitled to the peaceful and benignant operation and protecting safeguard of the statute, which is not in subservience to the title of another, either by a direct acknowledgment of some kind, or an open or tacit disavowal of right on the part of the occupant; and it is in the latter case only, that the law adjudges the possession of one to the benefit of another."

Abel *v.* Love—81 Ind. App. 328.

The hostile intent of a party in possession is generally evidenced by the character of his possession and acts of ownership. If these are sufficiently definite, open and exclusive, it will be presumed that they are done with the intent to appropriate the land. By such acts, it is said, the party "flies his flag," proclaiming to the public that he asserts an exclusive ownership over the land. No assertion of intention other than by acts is necessary. The mere fact of possession would, in general, indicate that the possession was adverse. Sedgwick and Wait, Trial of Title to Lands, §758. And where one is shown to have been in possession of land for the period of limitation, apparently as owner, and such possession is not explained or otherwise accounted for, it will be presumed to have been adverse; but this presumption may be rebutted by proof that the possession in its original was not adverse, but permissive. And as said in Washburn, Real Property (6th ed.) §1976: "Though such possession may be explained, so as to do away with the effect otherwise ascribed to it, the burden of so doing rests on the party seeking to overcome the effect of the twenty years possession."

This rule as to the presumption arising from possession for the statutory period is well expressed in *Craven* v. *Craven* (1913), 181 Ind. 553, 557, where the Supreme Court said: "It is well settled by decisions of this and the Appellate Court that an occupant, who, by mistake or by intention, takes actual, visible and exclusive possession of another's land and holds the same for twenty years as his own, acquires a title in fee simple. * * * Where one is shown to have been in possession of land for a period of limitation apparently as owner, and such possession is not explained or otherwise accounted for, it will be presumed to have been adverse; but the presumption may be rebutted by

proof that the possession, in its origin, was not adverse, but permissive."

In *Rennert* v. *Shirk, supra,* after an extensive review of the authorities holding that unexplained possession for twenty years raises a presumption that such possession was under a claim of right and adverse, the court at page 551, said: "In this State, when an owner ·of land, by mistake as to boundary line of his land, takes actual, visible, and exclusive possession. of another's land and holds it as his own continuously for the statutory period of twenty years, he thereby acquires the title as against the real owner. The possession is regarded as adverse, without reference to the fact that it is based on mistake; it being *prima facie* sufficient that actual, visible, and exclusive possession is taken under a claim of right."

In *Webb* v. *Rhodes, supra,* Webb filed his complaint to quiet title to a narrow strip of land which he claimed to own by adverse possession. The rights of the parties depended upon whether the possession was hostile or not. The facts were found specially, and after finding that Webb had purchased a part of a certain lot and that the strip in controversy was enclosed by a fence with that so purchased, that Webb was in possession of all the land within the enclosure, the court found the facts relative to the improvements, possession and acts of ownership of all the land as enclosed. The twelfth finding of the court was as follows: "That from the 8th day of June, 1864, the date of his purchase from said Fosdick, until the 28th day of January, 1890, the said Haag, either by residence in person with his family thereon, or by his tenants in possession of said premises, *was in actual, open and notorious, exclusive and continuous possession* of all the premises included within the inclosure extending up to such fence on the west side thereof, but such possession of the disputed

strip of ground by Haag or his tenants *was not hostile* to the rights and title of the real owner of the same; nor did said Haag, at any time, except as herein found, do anything whatsoever to show or indicate purpose and intention on his part to claim title to the disputed strip of ground, or any part thereof, adversely to the rightful owner."

The appellant there contended that the finding that the possession was not hostile was not sustained by the evidence. The evidence in that case, like the evidence in the instant case, was undisputed and the court, in discussing the effect of such evidence, said: "Its effect must be determined by reference to the following legal propositions: 'An entry upon land with the intention of asserting ownership to it, and continuing in visible, * * * possession under such claim, exercising those acts of ownership usually practiced by owners of such land, and using it for the purpose to which it is adapted, without asking permission, and in disregard of all other conflicting claims, is sufficient to make the possession adverse. Such possession, continued for twenty years or more, is equivalent to a grant. * * * The possession of real estate, its use and improvement by one as other persons are accustomed to use and improve their estates, continued for twenty years, without recognizing title in any one else or disclaiming it in himself, raises a presumption of entry and holding as owner, and, unless rebutted by other evidence, will establish the fact of claim of title.' * * * If Chas. Haag continuously and uninterruptedly, for more than twenty years, occupied said strip of ground up to the fence, claiming to be the owner of it, and that the fence was the dividing line, he thereby acquired an absolute and perfect title in fee to such land." See *Tolley* v. *Thomas* (1910), 46 Ind. App. 559, 566.

One in possession of property is presumed to be the owner of it. 3 Wigmore, Evidence §1779. "Possession alone with claim of ownership is itself title

8. of a low degree." *Teass* v. *City of St. Albans* (1893), 38 W. Va. 1, 17 S. E. 400, 19 L. R. A. 802.

Prescription rests upon the presumption of a past grant inferred from and evidenced by an adverse enjoyment for a period fixed by law. "The essence

9. of the doctrine is, therefore, the enjoyment of the right by the claimant, which enjoyment. *creates* title. The doctrine of limitations, on the other hand, rests upon no such presumption of a right or title in one other than the true owner of the land; on the contrary, it assumes the title to be in the latter but refuses to allow him to assert it because of his *want* of *possession*. The essence of the doctrine of limitations is technically, therefore, the *non possession* of the true owner, not as under the theory of prescription, the adverse enjoyment of someone else. Prescription is positive and creates; limitation is negative and destroys. The latter can properly be said to create only so far as it destroys a remedy or, as said in the leading case of *Humbert* v. *Trinity Church* (24 Wend. 587): 'It is of the nature of the statute of limitation * * * to mature a wrong into a right by cutting off the remedy.' " Sedgwick and Wait, Trial of Title to Land §726. So it is said: "The statute protects the occupant, not for his merit, for he has none, but for the demerit of his antagonist in delaying the contest beyond the period assigned for it, when papers may be lost, facts forgotten, or witnesses dead." *Sailor* v. *Hertzogg* (1845), 2 Pa. St. 182; *Webb* v. *Rhodes, supra; Mayer* v. *C. P. Lesh Paper Co.* (1909), 45 Ind. App. 250.

While the acts of the party claiming title by reason of the statute of limitations, under the doctrine of ad-

verse possession, are to be strictly construed, his acts when specially found or when proven by undisputed evidence are given the same legal effect and weight as are given to facts in any other kind of an action.

The rule is stated by the Supreme Court of Wisconsin in *Perkins* v. *Perkins* (1920), 173 Wis. 421, 180 N. W. 337, as follows: "All reasonable presumptions are to be made in favor of the true owners, including the presumption that actual possession is subordinate to the right of the true owner, subject, however, to the limitation that actual, continuous, exclusive possession for the statutory period, unexplained, displaces a presumption in favor of the true owner and creates a presumption of fact that such possession, and the commencement of it, were characterized by all the requisites to title by adverse possession. *Meyer* v. *Hope,* 101 Wis. 123, 77 N. W. 720; *Illinois S. C.* v. *Budzisz,* 106 Wis. 499, 514, 82 N. W. 534, 48 L. R. A. 830, 80 Am. St. Rep. 54." To the same effect see *Mielke* v. *Dodge* (1908), 135 Wis. 388, 115 N. W. 1099; *Hamachek* v. *Duvall* (1908), 135 Wis. 108, 115 N. W. 634.

In *Meyer* v. *Hope, supra,* the same court said: "The doctrine that evidence of adverse possession must be construed strictly and every reasonable presumption be made in favor of the true owner is well understood, but that does not avail against the fact of exclusive, notorious, unexplained, continuous occupation for the requisite period to acquire title by prescription. When that is established it is conclusive as to the nature of the possession till rebutted by some satisfactory evidence. It overcomes the presumption previously existing in favor of the true owner, and a presumption arises from the facts in favor of the occupant, that his occupancy was characterized by all other elements requisite to adverse possession, i.e., that it began by the requisite

entry, claiming title, to set the statute of limitations on the subject running, and so continued down to the end of the statutory period."

"Hostility of possession is not always the result of exclusive possession, although, as a general rule, the law presumes that exclusive possession of the land by one who is a stranger to the legal title holder is adverse, unless there is some family or other relation that may account for it." *Frazier* v. *Morris* (1914), 161 Ky. 72, 170 S. W. 496.

As was held by the Supreme Court of the United States in *Piatt* v. *Vattier* (1835), 34 U. S. 405, 9 L. Ed. 173, the general doctrine is that full force will be given to presumptions founded on time and that stale demands will not be enforced to disturb possession. A court of equity, which is never active in relief against conscience or public convenience, has always refused its aid to stale demands, where the party has slept upon his rights, or acquiesced for a great length of time. Nothing will call a court of equity into activity except conscience, good faith and reasonable diligence. When these are wanting the court is passive and does nothing. Laches and neglect are always discountenanced.

"The decisions of the court have determined the character of the possession which will thus bar the right of the former to recover real property. It must be an open, visible, continuous and exclusive possession, with a claim of ownership, such as will notify parties seeking information upon the subject that the premises are not held in subordination to any title or claim of others, but adversely to all titles and all claimants." *Sharon* v. *Tucker* (1892), 144 U. S. 533, 12 Sup. Ct. 720, 36 L. Ed. 532.

And the same court in *Ricard* v. *Williams* (1822), 7 Wheat. 59, 105, 5 L. Ed. 398, said: "Undoubtedly, if a person be found in possession of land, claiming it as

his own, in fee, it is *prima facie* evidence of his ownership, and seisin of the inheritance. But it is not the possession alone, but the possession accompanied with the claim of the fee, that gives this effect, by construction of law, to the acts of the party", and continuing on page 107, the court said: "For the law will never construe a possession tortious, unless from necessity. On the other hand, it will consider every possession lawful, the commencement and continuance of which, is not proved to be wrongful. And this, upon the plain principle that every man shall be presumed to act in obedience to his duty, until the contrary appears. When, therefore, a naked possession is in proof, unaccompanied by evidence as to its origin, it will be deemed lawful, and co-extensive with the right set up by the party. If the party claims only a limited estate, and not a fee, the law will not, contrary to his intentions, enlarge it to a fee. And it is only when the party is proved to be in by disseisin that the law will construe it a disseisin of the fee, and abridge the party of his right, to qualify his wrong."

So, the Supreme Court of Oregon held possession for the statutory period not proved wrongful will be presumed to be lawful, and title given thereby must prevail until party seeking to overthrow it shows a better one. *McEwen* v. *City of Portland* (1860), 1 Ore. 300.

Possession for such period may be explained, but it must be done by the party seeking to disturb

11. the effect of such possession. *Doe* v. *Lawley* (1834), 13 Q. B. 954.

Appellant's grantor, the insurance company, was in actual, open, visible, exclusive and continuous possession from 1855 until it conveyed the lots to Mrs.

12. Binge. Adverse possession may be kept up without a personal residence where the disseizor gives

leases to tenants, puts them in possession and receives rent from them claiming the land as his own. *Reed* v. *Proprietors of Locks and Canals* (1850), 8 How. 274, 12 L. Ed. 1077. The possession of Mrs. Simmons from 1899 until she surrendered possession to appellant was the possession of the insurance company.

Appellees argue that since the lot No. 64 has a frontage of several feet more than actually shown on the plat, it would be unjust to give the two and one-half feet to her when she has more land than she purchased. But appellees are not innocent purchasers. They and their grantor, Mr. Andrew, at the time they purchased, had knowledge that appellant was in possession of the land in controversy, and made no inquiry to ascertain what interest she had in the land. They, therefore, bought at their peril, and are in no position to claim they are innocent purchasers. *Decker* v. *Mahoney* (1917), 64 Ind. App. 500. Appellees not only had notice of appellant's possession when they purchased the property from Mr. Andrew but Mr. Andrew, at that time, furnished them with an abstract of title which showed he did not own the two and one-half feet in controversy. The taking of a quit-claim deed from the heirs of Mrs. Merke in June, 1922, created no equity in favor of appellees. Indeed, appellees do not come into court with any equities in their favor. Neither appellees nor any of their grantors were in possession of this land or made any claim to it for a period of at least thirty-seven years. Appellee, Mrs. Love, testified that when they bought the property from Mr. Andrew, she believed the fence marked the north line of the property they purchased. Their grantor, Mr. Andrew, so understood, and stated that he got a reduction in price when he bought because his grantor could not give him title to the two and one-half foot strip.

All of the essential elements necessary to perfect title through the statute of limitations as stated in the recent case of *Philbin* v. *Carr, supra,* are not only present in the instant case, but they are all established by undisputed evidence.    That is to say appellant's possession has been "actual, visible, notorious, exclusive, under claim of ownership, hostile to the owner of the legal title   *   *   *   and continuous for the full period prescribed by the statute."    With these facts established, without any conflict in the evidence, it is not necessary for us to determine whether the possession was adverse as an ultimate fact or as a matter of law.    If it be an ultimate fact, it is sufficient to say that the only reasonable inference that can be drawn from the evidence is that the possession of appellant was adverse.    If it be a question of law, the result is the same.    Quoting from *Pittsburgh, etc., R. Co.* v. *Stickley* (1900), 155 Ind. 312, 315.    "The possession for twenty-five years was continuous, open, peaceable, and under a claim, established by evidence, that the old fence was the true boundary, a claim   *   *   *   acquiesced in until it was too late to object."    See, also, *Rosenmeier* v. *Mahrenholz* (1913), 179 Ind. 467, 473; *Stalcup* v. *Lingle* (1921), 76 Ind. App. 242.

We, therefore, hold that, under the undisputed evidence in this case, appellant is the owner of the title to the land in controversy, and that the court erred in overruling the motion for a new trial.

Judgment reversed, with direction to sustain appellants' motion for a new trial and for further proceedings consistent with this opinion.