ROBERT F. CASSENS ET AL., APPELLANTS, V. DORA WISNER ET AL., APPELLEES.

FILED JANUARY 29, 1932. No. 28064.

*William E. Shuman* and *R. H. Beatty*, for appellants.

*Beeler, Crosby & Baskins*, contra.

Heard before GOSS, C. J., DEAN, EBERLY and PAINE, JJ., and WRIGHT, District Judge.

PAINE, J.

This is an ejectment action to recover the title and possession of 80 acres of land in McPherson county, Nebraska. At the close of the trial the jury brought in a verdict finding that the defendants were the owners of the east half of the southeast quarter of section 13, township 17 north, range 30 west of the sixth P. M., McPherson county, and were entitled to the possession of the same. The jury were duly polled, at the request of the plaintiffs, judgment entered on the verdict, and the motion for a new trial was overruled.

It may be stated that, while the bill of exceptions is quite long, there is practically no question of fact in dispute in the evidence in this case.

The 80 acres in controversy in McPherson county, together with 80 acres lying immediately east, across the line in Logan county, were taken as a homestead by William S. Rowsey, and after living upon the 80 acres in Logan county the required length of time, and making proof thereof at the United States land office at North Platte, a patent was issued to him, but never recorded. In the record there appears the photostatic copy of the duplicate patent retained in the general land office, showing that it was issued July 12, 1894. At about this date the said Rowsey left, never to return, and the first heard of him was when he gave a deed to the 80 acres in controversy to Silas E. Clothier, in Powder River county, Montana.

Robert H. Cassens, the father of the two plaintiffs, made a homestead entry upon the northeast quarter of this same section of land in 1900, and the land to which the title is in dispute is the east half of the southeast quarter in the same section. At the time Cassens made the entry and settlement, the county was still very sparsely settled. Boundary lines were uncertain, and were not fixed definitely until the government survey was made in later years. It was an open range country. At the time Cassens made his homestead entry, in 1900, Rowsey had been gone for six years, his improvements had disappeared, and the small amount of land that he had broken out had gone back to native grass and sod. Cassens by mistake broke out and cultivated 12 acres of land upon the 80 in controversy, and, as the land lay open and unused, he cut hay upon it and pastured it each year for 12 years, as a trespasser, but he never made any claim to the title.

Dewey Wisner, a ranchman, residing 40 miles away, purchased a tax sale certificate upon this 80 acres upon February 4, 1907, which tax sale included all taxes back to 1895, the year after it was patented, at which time it was first placed upon the tax lists, and Mr. Wisner paid the taxes for each year up to the time of his death in 1926. Neither Wisner nor Cassens personally knew the original entryman upon the land, William S. Rowsey. This land

was light grass land, and 40 acres in the same section has always remained government land.

Five years after purchasing the tax certificate upon the land, Dewey Wisner wrote a letter to Cassens, in which he said he was paying the taxes upon this land, and asked Mr. Cassens to send him $14.42 for the use of the land for the years 1912 and 1913, and the letter Robert H. Cassens wrote in reply, upon December 13, 1912, reads as follows: "Inclosed please find $14.42 which is for the two years' lease on the W. S. Rowsey 80 acres of land, the years 1912 and 1913. *What would you take for this land and turn it over to me?*" Every year thereafter Cassens leased the land from Wisner or his widow, paying as high as $30 a year rental thereon. Wisner never saw the land but once, so far as the evidence discloses, and only then at a distance. A few years after he had been receiving rent for it, he came to the door of the Cassens home, in the same section, one evening, and asked where that 80 was that he was paying taxes on. "Q. What occurred then? A. Mr. Cassens pointed to it down east, and he stood there on the doorstep and looked in that direction. Q. Then, what did he do? A. He went away." These parties never met, so far as the evidence discloses, but upon two other occasions. The first time was when the Cassens drove 40 miles to see if they could buy the land. This was in October, 1918, when they had Jim E. Main drive them down to Wisner's ranch on the Platte river valley; and Mr. Main testifies that Mr. Cassens wanted to buy the 80 acres, and question No. 626 is as follows: "Q. You may state what was said between them; what Mr. Wisner said and what Mr. Cassens said. A. Mr. Cassens spoke to him about wanting to buy it. He said, 'I don't have it so I can sell it, yet.' He said, he figured on getting a tax title."

The last time they met was in cattle-branding time of the spring of 1926. Their son took them down to Wisner's ranch again, and they found Mr. Wisner out by the windmill, and talked about buying the 80 acres, but "he said he didn't consider he had any title to it yet, so we let it go at that."

Robert F. Cassens and Lloyd E. Cassens, the plaintiffs, are the sons of Robert H. Cassens, who rented this land from the year 1912 until March 1, 1929, there being correspondence and other exhibits in the bill of exceptions relating to this period of uninterrupted tenancy of 17 years. Silas E. Clothier, who had received a deed of the land from Rowsey, dated February 11, 1927, deeded the ` 80 acres in question to the two plaintiffs upon March 23, 1929, and their ejectment action is based solely upon their ownership under said deed. The petition was in the ordinary form used in ejectment. The answer pleaded, first, a general denial, and then set up that the defendants inherited the land from Dewey Wisner, who, it is alleged therein, entered into possession of this land on or about February 4, 1907, and continued in the open, notorious, exclusive, continuous, and adverse possession, claiming title thereto until his death, September 27, 1926. The verdict of the jury being for the defendants, the journal entry based upon said verdict found that the defendants were the owners and entitled to the immediate possession thereof.

Among the 12 assignments of errors, we find the appellants complain particularly of the giving of instruction No. 7, which reads as follows: "The jury are further instructed that, in order for a person to establish title to real property in this state by adverse possession, there must have been maintained, by the party asserting it, an actual, exclusive, continued, notorious and adverse possession of the premises under claim of ownership for the period of ten years by the person asserting it, or his tenant for him." Appellants claim that, by the addition of these last five words, the instruction became ambiguous, uncertain, and an incorrect statement of the law. The appellees insist that, what a man may do by himself in the matter of taking and holding real estate, he may do by another, and cite 2 C. J. 73. In *Lantry v. Parker*, 37 Neb. 353, being a quiet title case upon adverse possession, this court laid down the rule: "The possession of one's agents is, for the

purpose of the statute of limitations, the possession of the principal."

In the case of *Strom v. Hancock Land Co.*, 70 Or. 101, the first paragraph of the syllabus reads: "Possession by an agent is the possession of the principal, for the purpose of acquiring title by adverse possession, though the principal never personally occupied the land." This case seems never to have been cited in Shepard's Citations, although it is directly in point. The appellants, in their reply brief in discussing this case, call attention to the fact that Mrs. E. Ryan, the adverse claimant, caused her tenant to erect a fence inclosing the land, and there was no such inclosure in the case at bar. Appellants also cite the case of the *Omaha & Florence L. & T. Co. v. Parker*, 33 Neb. 775, which holds: "To entitle a party to claim by adverse possession, he must have made an actual entry upon the land and occupied the same as owner. This occupancy, how ever, may be continued by his agents." The evidence discloses that in that case the parties claiming the land actually took possession of the land themselves and then placed tenants in possession, and we do not understand that the supreme court held in that case that it would be impossible to take possession of the land in the first place by and through a tenant.

Possession of a tract of land by an agent or tenant under adverse holding inures to the benefit of the adverse holder. Personal occupation in such a case is unnecessary. *Lantry v. Parker*, 37 Neb. 353; *McComb v. Saxe*, 92 Ark. 321; *Strom v. Hancock Land Co.*, 70 Or. 101; *Abel v. Love*, 81 Ind. App. 328. And it is held in *Pearce v. Wright*, 284 Ill. 221, that on the issue of adverse possession through a tenant it is immaterial whether the leases were written or verbal. "Possession through a tenant or agent is of course sufficient actual possession to support the claim of adverse possession." Tiedeman, Real Property (3d ed.) sec. 493.

We hold that the weight of authority supports the doctrine that the possession of a tenant, who entered by ex-

press right of a person who claimed to be the owner of the land, is the entry and possession of such owner. Under this view, the instruction complained of properly states the law of the case.

It is contended that in this case the possession was not notorious, nor was the boundary sufficiently defined. In closely settled communities it has been held that a substantial inclosure of the land is necessary, and that disseisin only extends to land so inclosed, and a right of ingress thereto. However, the rule cited does not apply to the open ranch or grazing land of the short-grass country. A clandestine use of land, of so secret a character that the owner would not notice it if he investigated, would not be sufficient. But, if the making of turpentine amounts to a sufficient possession of pine land (*Royall v. The Lessee of Lisle,* 15 Ga. 545) certainly the putting up of hay in the hay flats, and the pasturing of the shorter grass, and the plowing and tilling of a portion thereof, even if it was not all inclosed, would put an ordinarily prudent owner on notice that an enemy had taken over possession of his land, especially if the man claiming to be in possession by his tenant had paid the taxes thereon continuously for a period of approximately 30 years. *Holtzman v. Douglas,* 168 U. S. 278; *Stetson v. Youngquist,* 76 Mont. 600; *DeWulf v. DeWulf,* 104 Neb. 105; *Twohig v. Leamer,* 48 Neb. 247; *Lewon v. Heath,* 53 Neb. 707; *Kuh v. Flynn,* 108 Neb. 798; *Lantry v. Parker,* 37 Neb. 353.

The continuous, open, notorious, exclusive, and adverse possession of an 80-acre tract of land by pasturing the lighter portion thereof, and by mowing the grass long enough to make hay, and the tilling of a small portion thereof each year for more than 10 years, by and through a tenant, is sufficient to constitute adverse possession thereof.

There being no error in the record, the judgment of the district court is hereby

AFFIRMED.